Matthew K. Bishop (Mont. Bar No. 9968), *pro hac vice*
Western Environmental Law Center
103 Reeder's Alley
Helena, MT 59601
(406) 324-8011 (tel.)
bishop@westernlaw.org

John R. Mellgren (Oregon Bar. No. 114620), *pro hac vice*
Western Environmental Law Center
1216 Lincoln Street
Eugene, OR 97401
(541) 359-0990 (tel.)
mellgren@westernlaw.org

Sarah K. McMillan (Mont. Bar No. 3634), *pro hac vice*
WildEarth Guardians
P.O. Box 7516
Missoula, MT 59807
(406) 549-3895
smcmillan@wildearthguardians.org

Judith Calman, (N.M. Bar No. 138206), *pro hac vice*
New Mexico Wilderness Alliance
142 Truman St. NE, Suite B-1
Albuquerque, New Mexico 87108
Ph: (505) 843-8696
judy@nmwild.org

*Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| WildEarth Guardians *et al.*, | ) |
| | ) No. CV-15-00285-TUC-JGZ |
| Plaintiffs, | ) |
| | ) Consolidated with: |
| vs. | ) No. CV-15-0019-TUC-JGZ |
| | ) No. CV-15-00179-TUC-JGZ |
| Daniel Ashe, *et al.*, | ) |
| | ) |

Federal-Defendants.                ) MEMORANDUM OF LAW IN
                                   ) SUPPORT OF PLAINTIFFS'
                                   ) MOTION FOR SUMMARY
                                   ) JUDGMENT
                                   )
                                   ) (Oral argument requested)
_____ )

## TABLE OF CONTENTS

LIST OF EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

I.       The Service violated the ESA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        A.       The Service's decision to maintain the Mexican wolf's nonessential
                 status  violates section 10(j) of the ESA. . . . . . . . . . . . . . . . . . . . . . . . . . 7

                 1.       The new listing and revised rule triggered the need for
                          a new essentiality determination. . . . . . . . . . . . . . . . . . . . . . . . . . 10

                 2.       An essentiality determination must take into account a species'
                          changing status. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

                 3.       The 1998 essentiality determination – which the Service chose to
                          maintain in the revised rule – is arbitrary. . . . . . . . . . . . . . . . . . . .14

        B.       The Service's revised rule fails to use the best available science and
                 provide for the conservation of Mexican wolves. . . . . . . . . . . . . . . . . . . .21

                 1.       The best available science reveals capping the population will not
                          conserve Mexican wolves. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

                 2.       The best available science reveals restricting the amount of
                          "effective migrants" will not conserve Mexican wolves. . . . . . . . . 25

                 3.       The best available science reveals prohibiting dispersal north of
                          Interstate 40 will not conserve Mexican wolves. . . . . . . . . . . . . . . 27

                 4.       The best available science reveals allowing additional take in
                          response to "unacceptable impacts" to ungulate herds does not
                          conserve Mexican wolves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

i

C.      The Service's no jeopardy finding is arbitrary. . . . . . . . . . . . . . . . . . . . . . .34

II.      The Service violated NEPA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

A.      The Service failed to evaluate a reasonable range of alternatives . . . . . . . 39

B.      The Service failed to prepare a supplemental draft EIS. . . . . . . . . . . . . . . 41


CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .45

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

LIST OF EXHIBITS[1]

EXHIBIT  A          Declaration of Madeleine Carey

EXHIBIT  B          Declaration of John Horning

EXHIBIT  C          Declaration of Nathan Newcomer

EXHIBIT  D          Declaration of Jean Ossorio

EXHIBIT  E          Declaration of Peter Ossorio

EXHIBIT  F          Declaration of David Parsons

---

[1] Plaintiffs' Exhibits are properly before this Court as they are submitted solely to demonstrate Plaintiffs' satisfy the minimum requirements for Article III standing. *See Summers v. Earth Island Institute*, 129 S. Ct. 1142, 1149 (2009); *WildEarth Guardians v. U.S. Dep't of Agric.,* 795 F.3d 1148, 1154 (9th Cir. Aug. 3, 2015) (discussing requirements for Article III standing).

## INTRODUCTION

Plaintiffs, WildEarth Guardians *et al*., submit this memorandum of law supporting their motion for summary judgment. This case challenges the U.S. Fish and Wildlife Service's (Service's) January 16, 2015 revised rule establishing an experimental population of Mexican wolves pursuant to section 10(j) of the Endangered Species Act (ESA), 16 U.S.C. § 1539(j), (revised rule). This case also challenges portions of the Service's: (1) section 10(a)(1)(A) permit authorizing take of Mexican wolves traveling north of Interstate 40; (2) November 17, 2014 biological opinion; and (3) environmental analysis conducted pursuant to the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332 *et seq*.[1]

Mexican wolves are one of the most endangered mammals in North America. R000182; J015417. Less than one hundred currently exist in the wild and the population's ability to survive remains uncertain due to its small size, isolation, genetic poverty, and high rates of human-caused mortality. N053227; J015417; N042674.[2] The Service agrees, noting it is "fully cognizant that a small isolated population, such as the

---

[1] Citations in this brief are to documents included in the record. The prefixes preceding the Bates numbers distinguish between various sections of the record.

[2] The Service's most recent population survey (released on February 18, 2016) estimates the current Mexican wolf population in the wild to be 97, which represents a 12 percent decline from the 2014 population. *See* http://www.fws.gov/southwest/docs/2015MexicanWolfAnnualSurveyNRFinal18Feb2016.pdf.This survey updates earlier surveys in the record and is an undisputed matter of public record subject to judicial notice. *See* Fed. R. Evid. 201(b)(2); *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1025 n.2 (9th Cir. 2006).

existing experimental population, can neither be considered viable or self-sustaining." FR000175. In fact, even if the current population tripled in size, Mexican wolves would still face a "relatively high extinction rate." J015417 - J015418.

Meaningful changes to conservation efforts are therefore needed if Mexican wolves are to recover in the wild, as mandated by the ESA. The best available science reveals at least three populations of Mexican wolves in the southwestern United States, connected by dispersal, with each population simultaneously having at least 250 animals is needed for recovery. N053227; *see also* N004187; R000181; FR000175; C043056. This is the "minimum" necessary. N053227. Despite these findings, however, and agreement amongst the scientific community on what is needed for recovery, the Service's revised rule falls short by putting political expediency above scientific priorities and insisting on management prescriptions that will harm (not help) conservation efforts. In response, WildEarth Guardians *et al.* – a coalition of organizations dedicated to the recovery of the Mexican wolf – are compelled to pursue this civil action.

## BACKGROUND[3]

The Mexican wolf "is the smallest, rarest, southernmost occurring, and most genetically distinct subspecies of the North American gray wolf." N052624. Mexican wolves historically numbered in the thousands and were distributed across large portions

---

[3] This section provides a cursory overview of the background. Please refer to Plaintiffs' statement of facts, the revised rule, *see* FR000136, and the Service's draft recovery plan, *see* C043024, for more comprehensive background information.

of the Southwest, mostly in mountainous forest terrain that supports populations of deer and elk. FR000001; FR000138; *see also* R000671 (map). By the mid-1900s, however, government and private eradication efforts effectively wiped out the native population. N034452; FR000001; R000672 (discussing efforts). The government's eradication program alone reported "over 900 Mexican wolves killed in New Mexico and Arizona" during a ten year period, from 1915-1925. R000672-R000673. A greater number were likely killed for bounties. R000673; *see also* FR000002 (describing decline). By 1976, the Mexican wolf was likely extirpated from the United States. N034452.

In 1976, the Mexican wolf was listed as an endangered subspecies of gray wolf under the ESA, even though no wild populations were known to remain. FR000137; FR000061. In 1978, the Mexican wolf was later reclassified and listed as a gray wolf in the contiguous United States. *Id*. This listing prohibited take of any wolves, except in Minnesota where wolves were listed as threatened and subject to special regulations. *Id.*

After the ESA listing, the Service initiated recovery programs for gray wolves in three geographic areas, including the Southwest. In the Southwest, the Service prepared a recovery plan in 1982. *Id*.; R000887. The recovery plan did not contain recovery criteria because the status of the species at the time "was so dire that the recovery team could not foresee full recovery and eventual delisting." FR000138. The recovery plan focused instead on the wolf's "immediate survival." *Id*. The objective was to start a captive breeding program with the hopes of reestablishing a viable, self-sustaining population of Mexican wolves in the wild. *Id*. In accordance with the plan, a captive-breeding program

3

was initiated "with the capture of the last remaining Mexican wolves in the wild in Mexico and subsequent addition of wolves from captivity in Mexico and the United States." FR000139. All Mexican wolves alive today "descend from three captive lineages founded between 1960 and 1980 from a total of seven wolves." N053226. The captive population has grown to 248 wolves in 55 facilities in the United States and Mexico. FR000139; N048845.

In 1996, the Service initiated plans to reintroduce Mexican wolves to their historic range in the Southwest. This process began with the completion of an environmental impact statement (EIS) under NEPA. FR000137; N050858 (1996 EIS). Two years later – in 1998 – the Service promulgated a final rule establishing an experimental population for reintroduction pursuant to section 10(j) of the ESA. FR000001. In 1998, the Service released 13 Mexican wolves in eastern Arizona and western New Mexico in the "Blue Range Wolf Recovery Area." N053226; FR000019 (map). During the first five years, from 1998-2002, the Service conducted a110 releases but also 58 removals for various reasons. FR000140. Successful reproduction was first documented in 2003. N053226.

From 2003-2007, the Service conducted a total of 68 releases and translocations. FR000140. During this same period, the Service removed 84 Mexican wolves from the wild, primarily due to depredation claims. *Id*.; N042670 (table 1-2); FR000140. Many of the wolves removed were from "the most successful packs." N053226. These large-scale removals, coupled with less releases and high rates of human-caused mortality "fundamentally altered the trajectory of the population." N053227. By 2010, 89 Mexican

wolves released into the wild had been killed, due to illegal killings, vehicle collisions, legal killings (in response to livestock depredations), and natural causes. N042670 (table 1-2). In January 2010, only 42 Mexican wolves were detected in the wild, a decline from the 2006 count of 51. N053226. From 2010 to 2013, 10 Mexican wolves were released. N042670 (table 1-2). During this period, the Service documented a "higher average population growth rate" than in previous phases of the reintroduction effort. FR000140. At present, the estimated population of Mexican wolves in the wild is 97. *See supra* note 2. This population likely has an effective population (number of breeding animals) of approximately 28 animals. N042674. This number is "inadequate to ensure short or long-term genetic fitness" for the existing population. *Id*.

On January 16, 2015, the Service issued a final rule reclassifying the Mexican wolf as a distinct subspecies of gray wolf. N034449. The new listing removes the Mexican wolf from the gray wolf listing and identifies the Mexican wolf as a distinct subspecies that qualifies for "endangered" status by itself. N034449; N034473. The Service also finalized a revised experimental population rule for Mexican wolves, prepared a new EIS, released a new section 10(a)(1)(A) permit, and prepared a biological opinion for the revised rule pursuant to section 7 of the ESA. *See* FR000136; N042613; P002308; N043093.

## STANDARD OF REVIEW

The ESA and NEPA claims in this case are reviewed under the Administrative Procedure Act (APA), 5 U.S.C. § 706 *et seq. NEC v. Dombeck*, 304 F.3d 886, 891 (9th

Cir. 2002). Under the APA, courts "shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). While the APA standard is deferential, courts must nonetheless engage in a "thorough, probing, in-depth review" of the agency action. *Citizens of Overton Park v. Volpe*, 401 U.S. 402, 415 (1971). Courts must reject agency decisions based on an "erroneous interpretation of law," decisions that fail "to consider an important aspect of the problem," or explanations that run counter to evidence in the record. *League of Wilderness Defenders v. USFS*, 549 F.3d 1211, 1215 (9th Cir. 2008).

## ARGUMENT

### I.   The Service violated the ESA.

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *TVA v. Hill*, 437 U.S. 153, 179 (1978). The statute was enacted to forestall the extinction of species, whatever the cost, and allow species to recover to the point where the protections afforded by the ESA are no longer necessary. *Gifford Pinchot Task Force v. USFWS*, 378 F.3d 1059, 1070 (9th Cir. 2004). Survival and recovery are two different (though complementary) goals of the ESA. *Id.*

Here, the Service violated the ESA by: (1) issuing a revised rule that arbitrarily maintains the Mexican wolf's "nonessential" status; (2) inserting provisions in the revised rule that will harm recovery efforts; and (3) issuing a biological opinion that fails to consider important aspects of the problem and fails to utilize the best available science.

6

**A.    The Service's decision to maintain the Mexican wolf's nonessential status violates section 10(j) of the ESA.**

To achieve the ESA's goals, Congress gave the Service authority to "'live' trap and transplant (reintroduce) rare species, if necessary" for recovery. *Defenders of Wildlife v. USFWS*, 797 F.Supp.2d 949, 954 (D. Ariz. 2011) (citing 16 U.S.C.§ 1536(a)(1) and 16 U.S.C. § 1532(3)). In 1982, Congress took additional steps to further reintroduction efforts by adding section 10(j), 16 U.S.C. § 1539(j), to the ESA.[4]

Pursuant to section 10(j), the Service is authorized to release an "experimental population" of a listed species into the wild subject to certain requirements.16 U.S.C. § 1539(j). An "experimental population" is any population of an endangered or threatened species authorized for release that is "wholly separate geographically from non-experimental populations of the same species" and outside the current range of that species. 16 U.S.C. §§ 1539(j)(1),(2)(A). Before authorizing a release, the Service must find that it "will further the conservation of such species." 16 U.S.C. § 1539(j)(2)(A). The Service must also develop regulations identifying the experimental population, 16 U.S.C. § 1539(j)(2)(B), the geographic area where the regulations apply, 50 C.F.R. § 17.81(c)(1), and the specific management restrictions that apply (or not) to the population, 50 C.F.R. § 17.81(c)(3). The regulations must also include a determination,

---

[4] Section 10(j) was designed to address frustration over political opposition to reintroduction efforts. Congress hoped the provisions of section 10(j) would mitigate industry's fears and actually encourage private parties to host such populations on their land.*Wyoming Farm Bureau v. Babbitt*, 1999 F.3d 1224, 1232 (10th Cir. 2000) (citing H.R. Rep No. 97-567 at 8 (1982)); *see also U.S. v. McKittrick*, 142 F.3d 1170, 1174 (9th Cir. 1998) (section 10(j) gives more flexibility).

based solely on the best available science, as to whether or not the experimental population is "essential to the continued existence of an endangered species or a threatened species." *McKittrick*, 142 F.3d at 1176 (citing 16 U.S.C. § 1539(j)(2)(B)); *see also Wyoming Farm Bureau*, 199 F.3d at 1233 (same); 50 C.F.R. § 17.81 (c)(2) (same).

"Essential" means the experimental population's loss "would be likely to appreciably reduce the likelihood of the survival of the species in the wild." 50 C.F.R. § 17.80 (b). All other experimental populations that do not satisfy this definition are deemed nonessential. *Id*. Congress recognized that in most (not all) circumstances, experimental populations will likely be deemed nonessential. 49 Fed. Reg. 33885, 33888 (August 27, 1984) (citing H.R. Conf. Rep. No. 835 at 34). This is because the loss of a single experimental population will rarely appreciably reduce the likelihood of the entire species' or "parent populations'" survival in the wild. *Id*.; *see also* 49 Fed. Reg. at 33890 (same). Under "some circumstances," however, essential status may be justified "[w]here the biological facts support an essential designation." *Id*. at 33888. In those cases, the Service intends to make an essentiality finding. *Id.* [5]

_____

[5] The distinction between "essential" and "nonessential" populations is important because they are managed differently under the ESA. Essential experimental populations are treated as "threatened" species and, as such, are subject to special section 4(d) or 10(j) regulations providing more flexibility for their management.16 U.S.C. § 1539(j)(2)(C); 16 U.S.C. § 1533(d). As "threatened" species, essential populations are also subject to the consultation requirement of section 7 of the ESA, 16 U.S.C. § 1536, and qualify for the designation of critical habitat, see 16 U.S.C. § 1533(a)(3)(A). Nonessential experimental populations are treated as "threatened" species and subject to special section 4(d) or 10(j) regulations except that: (a) solely for the purposes of section 7, nonessential populations

In this case, when the Service originally promulgated an experimental population rule back in 1998, it determined the population – which, at the time, was part of the gray wolf (*Canis lupus*) listing – to be "nonessential" to the continued existence of the species as a whole. FR000012. The Service explained in 1998 that the nonessential determination is "necessary to obtain needed State, Tribal, local, and private cooperation" and that without it, "intentional illegal killing of wolves likely would harm the prospects of success." FR00004. The Service also justified its 1998 "nonessential" determination on the grounds that only "wolves surplus to the captive breeding program will be released." FR000005. As such, even "if the entire experimental population died, this would not appreciably reduce the prospects for future survival of the [species] in the wild" because the "captive population could produce more surplus wolves and future reintroductions still would be feasible if the reasons for the initial failure are understood." FR000003. The Service also explained that "essential" status is not required and that "essential" status has never been "used in the past," referencing similar rules for the red wolf, black-footed ferret, and California condor. FR000006.

In the 2015 revised rule for the newly listed Mexican wolf subspecies (*Canis lupus baileyi*), the Service chose to maintain and reissue the 1998 nonessential determination, without change. *See* 50 C.F.R. § 17.84(k)(2); FR000181 (same). The Service again reasoned, just as it did in 1998, that "even if the entire experimental population died, this

---

are to be treated as a species "proposed to be listed;" and (b) no critical habitat is to be designated for nonessential populations. 16 U.S.C. §§ 1539(j)(2)(C)(i), (ii).

would not appreciably reduce the prospects for future survival of the subspecies in the wild. That is, the captive population could produce more surplus wolves and future reintroductions still would be feasible if the reasons for the initial failure were understood." FR000174. The Service therefore "reaffirmed" its 1998 nonessential determination and did so in the absence of a new analysis or evaluation. J007811; *see also* J001807 ("we reaffirm" 1998 determination); J006364 (same); J008573 (same); J016442 (same). The Service later refers to this decision as one not to "reevaluate" or "revisit" the 1998 finding, *see* FR000174, but regardless of how the Service chooses to characterize its decision, the record reveals the Service chose to maintain and reissue the 1998 "nonessential" determination in the revised rule and did so in the absence of a new analysis or evaluation. *See* 50 C.F.R. § 17.84(k)(2); FR000181. This decision violates section 10(j) of the ESA and is arbitrary for three reasons.

### 1.    The new listing and revised rule triggered the need for a new essentiality determination.

First, pursuant to section 10(j) and the Service's implementing regulations, the Service's 2015 reclassification of the Mexican wolf as a distinct subspecies of gray wolf triggered the need for a revised rule which, in turn, triggered the need for a new and revised determination on essentiality as part of that rule. *See* 50 C.F.R. § 17.81(c)(2); 16 U.S.C. §1539(j)(2)(B); *see also McKittrick,* 142 F.3d at 1176 (rules must include determination on essentiality); *Wyoming Farm Bureau*, 199 F.3d at 1233 (same).

On January 16, 2015, the Service issued a final rule listing the Mexican wolf as an endangered subspecies under the ESA. N034472; 50 C.F.R. § 17.11(h). This

reclassification was made in response to "substantial revisions" to the gray wolf's taxonomy, including "major taxonomic revisions" recognizing the Mexican wolf as a distinct subspecies. N034450. Specifically, three studies on morphometric variation published since the earlier listing "conclude that the Mexican wolf is a morphologically distinct and valid subspecies." N034450 (citing studies). The Service also relied on genetic research to provide "additional validation" for its new listing decision. *Id*.

This change to the Mexican wolf's listing status – from an experimental population derived from a single species of gray wolf (*Canis lupus*) found throughout the contiguous United States to an experimental population derived from a distinct subspecies (*Canis lupus baileyi*) found only in portions of Arizona and New Mexico – triggered the need for a new and revised experimental population rule. *See* FR000136. As explained by the Service, the experimental population rule needed to be updated and revised to associate it with "the Mexican wolf subspecies listing rather than with the gray wolf species." FR00136; *see also* J001764 (same); J006381 (same). Having done so, the Service was then under an obligation to make a determination on essentiality as part of the new and revised rule. 50 C.F.R. § 17.81(c)(2). The Services' implementing regulations are clear: Regulations designating experimental populations shall include a "finding, based solely on the best scientific and commercial data available, and the supporting factual basis, on whether the experimental population is, or is not, essential to the continued existence of the species in the wild." 50 C.F.R 17.81(c)(2). As explained by the Ninth Circuit, section 10(j) of the ESA "requires two specific findings for regulations

pertaining to experimental populations: (1) that the establishment of such a population will further the species' conservation; and (2) that the population is either essential or nonessential to the species' conservation." *McKittrick*, 142 F.3d at 1176 (citing 16 U.S.C. § 1539(j)(2)(A),(B)). The Ninth Circuit's finding is consistent with legislative intent. When amending the ESA in 1982 to include section 10(j), Congress explained that "[w]henever the Secretary determines that a particular population, whether it is already established or proposed to be established, is an experimental population, he is also to determine, as part of the same rulemaking, whether the population is of a species that is in imminent danger of extinction [i.e., essential]." H.R. Rep. 97-567 at 35 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2807, 2835.

In this case, however, no new essential determination was made in the revised experimental population rule. In fact, the Service did everything required for an experimental population rule, *see* 50 C.F.R. § 17.81, except make a new determination on essentiality. The Service promulgated new experimental population regulations to for the newly listed subspecies, determined the new regulations would conserve the subspecies, identified the new experimental population area, and outlined the types of "take" allowed (both inside and outside the area), but neglected to evaluate and make a new essentiality determination. This is a violation of section 10(j) of the ESA and is arbitrary. 50 C.F.R. § 17.81(c)(2); 16 U.S.C. §1539(j)(2)(B); *McKittrick,* 142 F.3d at 1176.

## 2. An essentiality determination must take into account a species' changing status.

Second, a new essentiality determination is required because any decision on essentiality – whether it is a new decision or a decision to maintain the 1998 determination – must, by definition, take into account a species' changing and evolving status. As noted earlier, the term "essential" means an experimental population "whose loss would be likely to appreciably reduce the likelihood of the survival of the species in the wild." 50 C.F.R. § 17.80 (b). If it would, then "the population will be considered essential to the continued existence of the species." 49 Fed. Reg. 33885, 33888 (August 27, 1984) (citing H.R.Conf. Rep. No. 835 at 34). The "level of reduction necessary to constitute 'essentiality' is expected to vary among listed species and, in most cases, experimental populations will not be essential." *Id*. The Service explains that while an "essential" experimental population determination "will be a special case, not a general rule," each experimental population will be evaluated on its own, based on review of the best available information. *See id.* "Where the biological facts support an essential designation, the Service intends to make this determination." *Id.*

Essentiality determinations are thus made on a case-by-case basis, after review of the best available science on the relationship of the experimental population to the species as a whole, rangewide. 50 C.F.R. § 17.81(c)(2). By definition, essentiality determinations require the Service to: (a) evaluate the overall status of the species (or subspecies) in the wild and across its range; and then (b) evaluate whether the loss of the reintroduced population would reduce the likelihood of the species' (or subspecies')

13

survival in the wild. *Id.* For example, in the rule establishing a nonessential experimental population of black-footed ferrets in Wyoming, the Service explained that the population is considered "nonessential" because losing the population in Wyoming would not affect the other twenty-four reintroduction sites in Arizona, Colorado, Kansas, Montana, New Mexico, South Dakota, Utah, Wyoming, or in Canada and Mexico. 80 Fed. Reg. 66821, 66823 (October 30, 2015). The "loss of an experimental population in Wyoming will not appreciably reduce the likelihood of future survival of the ferret rangewide." *Id.*

In this case, the relevant biological factors and analysis on essentiality for Mexican wolves has changed since 1998, i.e., the experimental population of Mexican wolves is no longer part of a larger "parent population" of gray wolves or part of a listed species that exists across the contiguous United States. Instead, Mexican wolves are a distinct and valid subspecies, and the experimental population in eastern Arizona and western New Mexico is the only population in the wild in the contiguous United States. As such, the Service must reevaluate, as part of the revised rule, whether the population is "essential" to the continued existence of the *subspecies* in the wild. 50 C.F.R. § 17.81(c)(2). This has yet to occur.

### 3.   The 1998 essentiality determination – which the Service chose to maintain in the revised rule – is arbitrary.

Third, even if one assumes, *arguendo*, that the new Mexican wolf subspecies listing and revised rule does not trigger the need for a new essentiality determination (it does and must), the Service's decision nonetheless to maintain and re-issue the determination  – without change – is arbitrary and violates the ESA. This is because the

1998 nonessential determination was not based on the best available science. Instead, it was illegally premised on a finding: (a) that it was necessary to obtain State, Tribal, local and private cooperation and needed for "management flexibility," *see* FR000004; and (b) that even if the entire population in the wild died, this would not reduce the prospects of future survival of the species in the wild, *see* FR000003. Both of these findings conflict with section 10(j) of the ESA and are without merit.

Determinations on essentiality must be based on the best available science and biological factors, not political considerations or a desire for management flexibility. 16 U.S.C. § 15339(j)(2)(B); 50 C.F.R. § 17.81(c)(2); 49 Fed. Reg. at 33888. To the extent the Service and others demand "management flexibility" this can be obtained simply by designating an "essential" experimental population of Mexican wolves in accordance with section 10(j) of the ESA. *See* 16 U.S.C. § 1539(j)(2)(C). Special regulations for essential populations provide significant flexibility, just as they do for nonessential populations. 50 C.F.R.§ 17.81(c)(3). Such regulations may include measures to isolate the experimental population to certain areas and flexible provisions allowing for various kinds of "take." *Id.*; *see also* 49 Fed. Reg. at 33885 (discussing the benefits of regulations for *all* experimental populations); *Wyoming Farm Bureau*, 199 F.3d at 1231-1232 (same).

To suggest, therefore, that an experimental population must be nonessential to obtain "management flexibility" misconstrues section 10(j) of the ESA and conflates the management flexibility afforded to *all* experimental populations, as envisioned by Congress, with that provided solely to nonessential populations. The only difference

between essential and nonessential experimental populations established under section 10(j) is the: (1) obligation to consider designating critical habitat (as the Service does for all listed species); and (2) duty to consult pursuant to section 7 of the ESA, which only pertains to federal agency actions. 16 U.S.C. § 1539(j)(2)(C)(i). Neither of these two statutory obligations, however, render management of essential experimental population inflexible or unworkable.[6] Regardless, to the extent the Service premised its "nonessential" determination for Mexican wolves on a desire to avoid critical habitat and section 7 consultations, this would be improper and conflict with Congress' directive to premise such determinations solely on the best available science. 16 U.S.C. § 15339(j)(2)(B); 50 C.F.R. § 17.81(c)(2).

The Service's additional rationale for maintaining and reissuing the 1998 "nonessential" determination is equally invalid. The Service maintains that even if the entire experimental population died, this would not "appreciably reduce" the prospects of survival of the species in the wild because additional wolves in captivity would still be available for release. FR000003; FR000174. In the Service's own words: if the "captive population could produce more surplus wolves and future reintroductions still would be

---

[6] The designation of critical habitat, for example, is not automatic or rigid. The Service is only required to designate critical habitat "to the maximum extent prudent and determinable," 16 U.S.C. § 1533(a)(3)(A), and must take into account the "economic impact" of such designations, 16 U.S.C. § 1533(b)(2). The Service can also exclude an area if it determines the benefits of exclusion "outweigh the benefits" of inclusion. 16 U.S.C. § 1533(b)(2). Likewise, the consultation requirements under section 7 of the ESA pertain only to "federal actions" that "may affect" listed species. 16 U.S.C. § 1536. Section 7 imposes no consultation obligations on State, Tribal, or private entities. *Id*.

feasible if the reasons for the initial failure were understood" then the sole experimental population in the wild is not "essential" to the survival of the species. *Id.* Under this reasoning, the loss of an entire experimental population in the wild – even if it is *the only* population of the subspecies in the wild –would not "appreciably reduce" the prospects of the survival of the subspecies in the wild so long as additional "surplus" animals in zoos, holding pens, or captive-breeding facilities remain available for release. *Id.* In other words, it is permissible for Mexican wolves to go extinct in the wild, so long as captive breeding programs that produce more "surplus" Mexican wolves are maintained in perpetuity. This interpretation is antithetical to the ESA's conservation mandate, conflicts with section 10(j), and is entirely unreasonable.

The ESA's primary goal is to get listed species off the life support system of human intervention and preserve their ability to survive and recover in the wild, on their own. *See* 16 U.S.C. § 1531(b) (purpose of ESA is to conserve "ecosystems" upon which species depend); 16 U.S.C. § 1532(3) (defining "conservation" as using all methods necessary to bring listed species to point at which the measures provided by the ESA are no longer necessary); H.R. Rep. No. 95-1625, at 5, *reprinted in* 1978 U.S.C.C.A.N. at 9455 (discussing ESA's focus on natural populations).

This is why endangered and threatened species' recovery under the ESA takes place in the wild, not in captivity. *See* 50 C.F.R. § 17.80(b); 50 C.F.R. § 402.02 (defining "jeopardize the continued existence of a species"). This is also why the number of Mexican wolves held in captivity and available for release – while a critical and essential

component of the recovery effort – are not counted as part of the recovery goal. *See* FR000138-FR000141 (population goals based on number of wolves in the wild); N042672 (same); C043103-C043109 (same); N053227 (recovery requires three populations in the wild); N004195 (same); R000181 (same); N050629 ("recovery, even for a large predator, means recovery in the wild."). This approach is consistent with the approach taken by the Service for other listed species. *See California State Grange v. NMFS*, 620 F. Supp.2d 1111, 1155-1156 (E.D. Cal. 2008) (discussing issue and citing other listed species where the Service does not count individuals held in captivity as part of the ESA's recovery goal). Recovery efforts should aim "toward establishing self-sustaining populations." *Id.* at 1157. An interpretation that permits exclusive reliance on a captive breeding program is thus antithetical to recovery efforts. *Id.*

Here, the Service's interpretation – which relies exclusively on the captive breeding program and future availability of wolves for release – turns the ESA's goal for endangered and threatened species recovery *in the wild* on its head and mistakenly reads "into the wild" out of section 10(j). Having 250, 500, or even a 1,000 Mexican wolves in captivity, holding pens, and zoos does not fix the problem, satisfy the ESA's recovery goals, or transform an essential population in the wild into a "nonessential" one, as the Service asserts. Consistent with the ESA's recovery goals, a determination on "essentiality" is premised on the impact the population in the wild, if lost, would have on the species in the wild, not on the number of wolves in captivity or zoos available for future release. *See* 50 C.F.R. §§ 17.80(b), 17.81(c)(2). Indeed, section 10(j) of the ESA

directs the Service to determine whether the experimental population is "essential" to the continued existence of the species *in the wild*. 50 C.F.R. § 17.80(b); *see also* Fed. Reg. at 33888 (citing H.R.Conf. Rep. No. 835 at 34). If the only population of a listed subspecies in the wild – here, a single population of Mexican wolves that only exists in portions of Arizona and New Mexico – is lost, it would do more than "appreciably reduce the likelihood of" the subspecies' survival in the wild; it would eliminate it altogether.

Finally, even if one assumes, *arguendo*, that the Service is able to read "in the wild" out of the ESA's statutory scheme and regulations, *see* 50 C.F.R. § 17.80(b), and rely exclusively on the "captive population" of Mexican wolves and future releases to support its nonessential determination, *see* FR000174, then, at the very least, the Service must evaluate and explain that decision. The Service must evaluate and explain how the current captive population it relies on– which is in trouble, genetically impoverished, and consists of only 248 individuals originating from 7 individuals, *see* N048845 – is and will continue to be capable of replacing a lost wild population of approximately 100 wolves. Factors to consider include the importance of the wild population, the number of captive wolves needed to replace a lost wild population (approximately 40% of the captive population, *see* N048845), political opposition and barriers to releases, the poor genetic makeup of the captive population (which continues to decline), *see* N048845, the time lapse and changes that have occurred to the captive breeding program since 1998, and the number of suitable captive Mexican wolves even available for release (many wolves in

19

captivity have already been deemed "non-releasable" due to age, health, or having already been removed from the wild).

The Service, however, never evaluated these and other relevant factors or otherwise discussed the importance of the wild population or the current state of the captive breeding program in the context of making an essentiality finding. Instead, the Service simply concludes – without support – that the nonessential finding remains valid. FR000174. This does not suffice. *See Pacific Coast Federation of Fisherman's Assoc. v. US Bureau of Reclamation,* 426 F.3d 1082, 1091 (9th Cir. 2005) (agency must articulate a basis for its conclusion); *Northern Plains Resource Council v. STB*, 668 F.3d 1067, 1075 (9th Cir. 2013) (same). A "satisfactory explanation of agency action is essential for adequate judicial review, because the focus of judicial review is not on the wisdom of the agency's decision, but on whether the process employed by the agency to reach its decision took into consideration all the relevant factors." *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1143 (9th Cir. 2001).

In the end, if the experimental population of Mexican wolves at issue in this case – the only wild population of Mexican wolves – is not "essential" to the survival of the subspecies in the wild, then no experimental population will ever be essential. This is not what Congress intended. *See* 16 U.S.C. § 1539(j)(2)(B). The Service correctly notes that "in most cases" experimental populations will not qualify as essential. FR000174 (citing H.R. Conf. Rep. No. 835 at 34). But "most" does not mean "all" cases. Exceptions, like the one presented by the single population of Mexican wolves in the wild, exist and must

be evaluated in accordance with section 10(j) of the ESA. The Service committed itself to doing so by agreeing to evaluate each experimental population on a case-by-case basis and to go where the evidence leads, *see* 49 Fed. Reg. at 33888, but this never happened.

To date, the Service has yet to establish a single "essential" experimental population pursuant to section 10(j) of the ESA. *See* 50 C.F.R. § 17.84 (listing experimental population rules). If the Service's "nonessential" determination for the experimental population of Mexican wolves – one of the rarest mammals in North America and the only population (experimental or otherwise) in the wild – is allowed to stand in this case, it is hard to imagine an experimental species will ever been deemed "essential." The Service has effectively written the "essential" status for experimental populations out of section 10(j) of the ESA. *See National Wildlife Federation v. NMFS*, 524 F. 3d 917, 932 (9th Cir. 2007) (rejecting interpretation that reads text out of ESA).

> **B.      The Service's revised rule fails to use the best available science and provide for the conservation of Mexican wolves.**

Treating all experimental populations of Mexican wolves as "threatened" allows the Service to prepare special regulations in accordance with section 4(d) of the ESA. FR000137; 50 C.F.R. § 17.82; *see also* 16 U.S.C. § 1533(d) (protective regulations for threatened species); 16 U.S.C. § 1539(j)(2)(c) (members of experimental populations to be treated as threatened). "All experimental populations . . .  are to be treated as though they have been separately listed as threatened species. This provision obligates the Secretary to issue such regulations as he deems necessary and advisable to provide for the conservation of the experimental population, just as he now does under subsection 4(d)

for any other threatened species." *Sierra Club v. Clark*, 755 F.2d 608, 617, n.10 (8th Cir. 1985) (citing S. Rep. No. 418, 97th Cong., 2d Sess. 8 (1982)); *see also* FR000142 (discussing application of special regulations).

These special regulations – while providing for management flexibility – must, at a minimum, provide for "the conservation of such species." 16 U.S.C. § 1533(d); *see also* FR000136 (conservation is purpose of revised rule). The ESA defines "conservation" as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided . . . are no longer necessary." 16 U.S.C. § 1532(3). The term is broader than mere survival. *Gifford Pinchot Task Force*, 378 F.3d at 1070. Conservation means the species recovers to the point where it may be delisted. *Id.*

According to the best available science, including published literature, evidence in the record, and statements from the Service's biologists, conserving Mexican wolves requires the establishment of at least three populations connected to one another by dispersal, with each population simultaneously having approximately 250 animals for a minimum of eight years (two generations). N053227; N004187; R000181; C043056; N067606. Using a sophisticated landscape analysis, Carroll (2006), Wayne and Hedrick (2010), and Carroll (2014) recommend these three Mexican wolf populations include: (1) the current population in the Blue Range Recovery Area; (2) a second population near the north rim of the Grand Canyon in Arizona (north of Interstate 40); and (3) a third population in north-central New Mexico's and southern Colorado's San Juan and Sangre

de Cristo Mountains. N053227; *see also* N053226 (map of three populations); R000188 (same); N004187 (same); C0430556-C043060 (discussing importance of three areas). Pursuant to the ESA, the Service's revised rule must work towards this recovery mandate. 16 U.S.C. § 1533(d); *Sierra Club*, 955 F.2d at 617 n.8.  But  many provisions of the revised rule do just the opposite by undermining the path towards recovery that is charted by the best available science. These provisions include: (1) capping the experimental population at 300-325 Mexican wolves; (2) restricting the number of Mexican wolves released; (3) limiting the Mexican wolf's ability to move and disperse to suitable habitat north of Interstate 40; and (4) increasing the type and circumstances of allowable "take."

### 1.    The best available science reveals capping the population will not conserve Mexican wolves.

First, the revised rule fails to conserve Mexican wolves by capping the experimental population at 300-325. FR000187; N042672. So as not to exceed this cap, the Service "will exercise *all* management options with preference for translocation to other Mexican wolf populations . . . ." FR000187 (emphasis added). This means Mexican wolves can be forcibly removed from the wild (or even killed) once the 300-325 population cap is met. *Id*. The best available science reveals this population cap – which is being imposed on a single population – will harm recovery efforts. *See* J015417 (single population at sizes contemplated showed a "relatively high extinction rate").

As noted earlier, the recovery of Mexican wolves in the Southwest requires at least three populations of Mexican wolves connected by dispersal, with each population

simultaneously having at least 250 animals. N053227; *see also* R000181 (Carroll *et al*.

(2014)); N073707. The critical aspects of this "restored" Mexican wolf population are:

(1) the establishment of at least three populations (as opposed to a single, isolated

population) that are (2) sufficiently large (at least 250 individuals) and of equal size, and

(3) well connected to allow for the dispersal and movement of Mexican wolves and the

genes they carry. N053227; R000181. In other words, the "conservation" and recovery of

Mexican wolves requires a population of least 750 Mexican wolves in three,

interconnected subpopulations (of equal size). This is the "minimum necessary" for

recovery. N053227. No published or peer-reviewed papers suggest otherwise.

Notably, the Service originally stated that a population cap was inappropriate and

inconsistent with recovery efforts, *see* N067610, N057673 and N074315, and that

Mexican wolf recovery "will require the establishment of several large populations,

connected by dispersal." N059003 (citing the best available science); *see also* N073707

(same); N052278 (recognizing the importance of having multiple populations of

sufficient size to achieve recovery); C043056 (same). In the final iteration of the revised

rule, however, the Service did an about-face and inserted a hard population cap of 300-

325 Mexican wolves. FR000187. For support, the Service insists the population cap is

consistent with the best available science, including Wayne and Hedrick (2010) and

Carroll (2014). FR000141. But the Service misinterprets and misrepresents those

published papers, which predicted a rate of extinction for a "restored" population of

Mexican wolves with *three* distinct but connected subpopulations, not a single isolated population of 300-325 Mexican wolves. *See* J015414; N053227; R000181.

This is why the authors of Wayne and Hedrick (2010) and Carroll (2014) wrote the Service to "correct the record" and address the Service's citations which "misstate, misinterpret or provide incorrect context for the results and implications" of their studies. J015414. The authors explain that the results of the published science predicted a rate of extinction "for a population when it is present within a metapopulation of three connected populations," not a "single isolated population." J015415. The predicted extinction rate only occurs "if each population is present within a larger population." *Id*.

According to the biologists, therefore, the Service's population cap of 300-325 for the lone population of Mexican wolves inhabiting the Southwest is wholly inadequate to provide for the conservation (recovery) of the subspecies. An isolated population of 300-325 wolves originating from the genetic composition of the Mexican wolves currently in the wild – as currently authorized by the Service's final rule – "showed a relatively high extinction rate*,*" long term decline in population size in those populations that did not go extinct, and significant decline in genetic viability. J015417 to J015418.

### 2. The best available science reveals restricting the number of "effective migrants" will not conserve Mexican wolves.

Second, the revised rule fails to conserve Mexican wolves by limiting the number of effective migrants, i.e., the number of individuals released into the wild from the captive population. FR000142; N042674. According to the best available science, the current population of Mexican wolves in the wild has extremely low levels of gene

25

variation, well below what is needed for healthy reproduction. N042673. Increasing the number of effective migrants is therefore vital. *Id.* "When gene diversity falls below 90% of that in the founding population, reproduction may be increasingly compromised by, among other factors, lower birth weights, small litter sizes, and greater neonatal mortality." N048845; N042673. As of July 2014, Mexican wolves in the wild had a retained gene diversity of 74.52% and there is currently "evidence of inbreeding depression." N042673. In fact, Mexican wolves in the wild are currently 50% more closely related to one another than those in captivity (due to inadequate representation in the wild population of two of the three Mexican wolf lineages). *Id.* As such, "without management action to improve its genetic composition, inbreeding will accumulate and heterozygosity and alleles will be lost much faster than in the captive population." *Id.*

In the revised rule, however, the Service limits the number of effective migrants to only two per generation (every four years) "while the population is around 100-250 animals." N042674; *see also* FR000141 (same). The Service also explains this "number could decrease to one effective migrant per generation at population sizes greater than 250." *Id.* To support this approach, the Service relies, once again, on Carroll (2014) and Wayne and Hedrick (2010). But, once again, the Service misinterprets and misrepresents the findings of these published papers. These papers estimated a "rate of effective migration that would ensure acceptably low long-term erosion of genetic health in a recovered metapopulation *of* three populations," not a single population. J015417. This is why, as explained by the authors, the Service's proposal regarding the amount of

26

effective migrants is "inadequate" to address the genetic threats already facing the population. J015416. The Service's proposal is simply too low to provide for the genetic integrity of the experimental population. J015417.

While two effective migrants per generation "may be enough to maintain the existing level of heterozygosity in the [experimental] population" under certain conditions, those conditions are not present in the existing Mexican wolf experimental population. *Id*. Given the "current depauperate genetic composition" and the "high relatedness" of the existing experimental population, in order "for this population to contribute to recovery it is necessary to not only forestall further genetic degradation but also reduce the high relatedness of the [experimental] population and increase its levels of genetic variation." *Id.* Releases from the captive population, therefore, at the rate proposed by the Service, are "inadequate to address current genetic threats" facing the experimental population and thus inadequate to ensure the recovery of the subspecies. *Id.*

### 3. The best available science reveals that prohibiting dispersal north of Interstate 40 will not conserve Mexican wolves.

Third, the revised rule fails to conserve Mexican wolves by restricting where they can move and disperse. Pursuant to the revised rule and in accordance with the Service's associated section 10(a)(1)(A) permit, Mexican wolves that travel outside the experimental population area will be captured and removed and either returned or transferred to captivity, regardless of whether they have been engaged in nuisance behavior or a depredation. P002311; FR000149; N042684; N043123; *see also* FR00184 (map depicting boundaries). All non-problem wolves that travel north of Interstate 40

will be removed. *Id*. The best available science reveals this provision will significantly harm, not help or "enhance" conservation efforts.[7]

Mexican wolves naturally disperse from their natal pack in response to a variety of factors including "food competition, mating opportunities, environmental disruptions, social aggression and/or pressures associated with pack dominance hierarchy." N042678 (citing Mech and Boitani (2003)). The benefits of dispersal include "increased reproductive success, decreased probability of inbreeding, release from intraspecific competition for resources and range expansion." *Id*. As such, allowing Mexican wolves to naturally disperse throughout suitable habitat in the Southwest has significant benefits for conservation efforts. Dispersal better supports natural Mexican wolf biology and behavior and removes restrictions that constrain natural growth and genetic diversity, which is desperately needed for the current population. N042677. Natural dispersal also improves the resilience and probability of persistence of the single Mexican wolf population in the wild. N042677; *see also* N052275 (the likelihood of persistence increases with the number of sites inhabited by a species).

Indeed, as the Service concedes, a Mexican wolf population that is "larger and more widely dispersed across a broader landscape would be more resilient to stochastic demographic and environmental events, as well as human caused mortality." N042678.

---

[7] In addition to the conservation mandate for section 10(j) regulations, discussed above, section 10(a)(1)(A) permits to take listed species are only allowed "for scientific purposes or *to enhance* the propagation or survival" of listed species, 16 U.S.C. § 1539(a)(1)(A) (emphasis added).

28

Conversely, removing Mexican wolves for no other reason than being outside an artificial boundary restricts natural dispersal, increases the costs of the overall recovery program, and excludes important habitat that could enhance recovery efforts. *Id.*

Despite these findings, however, the Service chose to prohibit all Mexican wolf movement outside the experimental population area. This means Mexican wolves are excluded from much needed recovery habitat north of Interstate 40 in Arizona and New Mexico. *See* N004187 (Fig. 2); R000188 (Fig. 4); N053226 (Fig. 1). These areas, specifically habitat near the north rim of the Grand Canyon and portions of northern New Mexico, are "suitable" for Mexican wolf recovery because they meet the "productivity threshold" allowing for breeding. N004187 (Fig. 2); N053226 (Fig. 1); *see also* N059594 (map showing potential wolf habitat in relation to Interstate 40). This area also includes large amounts of suitable habitat deemed critical to the long-term recovery of the Mexican wolf. N053227; N004193. The Grand Canyon site, in particular, is exceptional. N0004193. The landscape shows "a high probability of success (low extinction rates) and rapid geographic expansion" and habitat that is "more resilient to landscape change" than other areas, including the experimental population area currently occupied by Mexican wolves. *Id.* But pursuant to the Service's revised rule, this recovery habitat is off-limits to dispersing Mexican wolves. This is problematic, because it excludes important habitat that could enhance recovery efforts and prohibits the establishment of new populations which, as discussed above, are necessary for recovery.

Mexican wolves – like other species – need more, not less habitat, to recover in the Southwest. *See Gifford Pinchot Task Force v. USFWS*, 378 F.3d 1059, 1069 (9th Cir. 2004) (it is "logical and inevitable" that a species needs more habitat for recovery than is necessary for survival). And, the best available science demonstrates that two of the three populations needed for recovery of Mexican wolves would live north of Interstate 40. *See* N053226 (map); R000188 (same); C043056 (same). By limiting natural dispersal to these areas, the Service is thus limiting recovery and the ability for additional populations to form which, according to the Service's own experts, only increases the likelihood of extinction. N052275; FR000175. As the Service concedes, the establishment "of a single experimental population of Mexican wolves is inadequate for recovery" and the existing population "can neither be considered viable or self-sustaining." FR000175.

The Service explains the revised rule and its decision to restrict movement north of Interstate 40 is an important "first step" in recovery. N042684. But as noted by the leading biologists, including Wayne, Hedrick, and Carroll, taking the appropriate steps now, in the revised rule, is critical to long-term success. There is an important relationship between "short-term management actions" proposed now and "the conditions (population size, number, and connectivity)" ultimately needed for recovery in the future. J015418. The Service's decision to limit Mexican wolf dispersal, in particular, "could have deleterious effects in the near term on the genetic viability of the subspecies." *Id*. The Service cannot wait to implement much needed recovery actions. Decisions made

30

now regarding population size, the number of effective migrants, and dispersal north of Interstate 40 may have long-term implications for the Mexican wolf's recovery. *Id.*

> **4.**   **The best available science reveals allowing additional take in response to "unacceptable impacts" to ungulate herds will not conserve Mexican wolves.**

Fourth, the revised rule fails to provide for the conservation of Mexican wolves by increasing the type of allowable "take."[8] Pursuant to the revised rule, take of Mexican wolves will be now allowed if "unacceptable impacts" are deemed to occur to wild ungulate herds. FR000185. An "unacceptable impact" will either be determined by "a State game and fish agency based upon ungulate management goals" or a "15 percent decline in an ungulate herd as documented by a State game and fish agency." FR000182. Once the states determine an "unacceptable impact" has occurred, then, upon approval of the Service, they will be allowed to take, including kill, Mexican wolves. FR000185. This is above and beyond the types and amount of "take" already authorized by the revised rule, i.e., take from illegal killing, vehicle collisions, trapping, and livestock depredation or "nuisance" behavior, that has kept the subspecies from recovery. N0532227. As such, this new take provision is making a bad situation even worse.

Indeed, the illegal killing of Mexican wolves remains a problem: the "illegal killing (or 'take') of Mexican wolves currently occurs at significant levels in both the United States and Mexico." N034462. Such illegal killings typically involve "illegal

---

[8] "Take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in such conduct." 16 U.S.C. § 1532 (18).

shooting with a firearm or arrow, and trap related mortalities." N052664 (note a). In the United States, of the 100 documented Mexican wolf mortalities reported as of December 31, 2013, 55% (55 total) were from illegal killings, *see* N052664 (table 4) and N042670 (table 1-2), making it a "significant threat" to the subspecies. N034470. "In the southwest, illegal shooting of wolves is the single greatest source of wolf mortality in the reintroduced population." N052274. Additional sources of human-caused Mexican wolf mortality include 14 from vehicle collisions, 5 from "capture related mortalities and legal shootings by the public," and 12 killed by lethal control due to "nuisance" behavior or livestock depredations, N042670 (table 1-2, note 2). Additional Mexican wolves were also captured and removed from the wild and not returned or replaced, resulting in an additional net loss to the wild population of 17 animals. N042670 (table 1-2, note 3).

"Take" in the form of human-caused mortality or removal has therefore already had a significant, adverse impact on recovery. Approximately 112 of the 200 Mexican wolves released in the wild as of December 31, 2013 – over 50% of the reintroduced population – were either killed by humans (86 wolves) or permanently removed from the wild (17 wolves). N42670 (table 1-2). And these are only the documented incidents. The Service admits it "may not be documenting all mortalities to the population because mortality of uncollared wolves is not typically detected." N034463. We "may be underestimating the number of mortalities caused by illegal shooting." N034462.

While some gray wolf populations can maintain themselves despite high rates of human-caused mortality (in the 17 to 48 percent range), that is not the case with Mexican

32

wolves. N034462. Given the Mexican wolf's extremely small population size (approximately 100) and low genetic diversity, the current level of "take" is having a significant influence on the subspecies' survival and extinction rate. N034469. "The small population size of the Mexican wolf exacerbates the potential for all other factors, [including take] to disproportionately affect the Mexican wolf." N034469.  The Service also believes that the human-caused Mexican wolf mortalities are "additive," i.e., they are in addition to other mortalities, rather than compensatory mortality where the deaths from illegal shooting would substitute for deaths that would occur naturally. N034462.  Such mortalities are thus having a "negative effect on the size and growth rate" of the experimental population. *Id.* "Overall, human-caused mortality from illegal killing and road kills, and removals mainly due to human conflict, have severely impacted the ability of [the Mexican wolf] population to grow." N053227.

As shown in Carroll *et al*. (2014), extinction rates for Mexican wolves are highly dependent on assumptions regarding mortality rates. J015416; J015417; R000187 (Fig. 3). "In simulations that assumed [adult] mortality rates would remain greater than 22.9%, extinction risk was substantially higher and larger population sizes were necessary to achieve an extinction risk of 5% or less." J015416; R000187 (fig. 3). The current mortality/removal rate for Mexican wolves is above 50%. N042670 (table 1-2).

Notably, this unacceptable level of Mexican wolf take occurred under the Service's 1998 experimental population rule, which limited "take" to specific circumstances, mainly involving wolves "engaged in the act of killing, wounding, or

33

biting livestock." FR000012. The Service's new rule makes a bad situation worse by expanding the circumstances of allowable take beyond those included in the 1998 rule. Without question, the new take allowance for "unacceptable impacts" to wild ungulate herds does not provide for the conservation of Mexican wolves or in any way assist with recovery efforts or improve the status quo. On the contrary, it allows for additional take of Mexican wolves above and beyond an already dangerously high mortality level that, according to the best available science, will impede recovery. J015417; N053227.[9]

### C.    The Service's no jeopardy finding is arbitrary.

To achieve the ESA's recovery goal, Congress directed federal agencies to engage in consultation with the Service to ensure any actions it funds, authorizes or carries out are "not likely to jeopardize the continued existence" of any listed species. 16 U.S.C. §1536(a)(2). Actions that are "likely to adversely affect a listed species" must obtain a biological opinion from the Service discussing the effects of the action and including a finding whether the action "is likely to jeopardize the continued existence" of the species. 16 U.S.C. §1536(a)(2); 50 C.F.R. § 402.14.  The phrase "jeopardize the continued

---

[9] The new ungulate take provision also gives too much leeway to states to determine, at their discretion, when unacceptable impacts occur. *See* FR000182. As noted by a peer reviewer, the language is "so loosely worded and unqualified as to allow a wide variety of interpretations." FR000150. The Service does not define what the "ungulate management goals" needed to determine "unacceptable impacts" are, presumably leaving that task up to the states. *See* FR000182; FR000185. Evidence in the record reveals the new ungulate take provision was added at the behest of Arizona and New Mexico to "protect" ungulate populations to make more money on hunting permits. *See* J013484 (e-mail to New Mexico); FR000150 (definition based on information from states); J013487 (states "are good with the language"); J013474 (same). The provision was thus driven by economic (not biological) concerns.  *See* N059006.

34

existence of" means to engage in an action that appreciably reduces the likelihood of the survival and recovery of a listed species in the wild. 50 C.F.R. § 402.02. Impacts to both the survival and recovery must be addressed in the biological opinion's jeopardy finding. *National Wildlife Federation*, 524 F.3d at 931. The jeopardy finding must also be based on the best available science. *Id.*; 50 C.F.R. § 402.14(g)(8). This standard does not require the Service to conduct "new tests or make decisions on data that does not yet exist," *Center for Biological Diversity v. USFWS*, 807 F.3d 1031, 1047 (9th Cir. 2015) (citation omitted), but it does prohibit the agency from "disregarding available scientific evidence that is in some way better than the evidence [it] relies on." *Kern County Farm Bureau v. Allen*, 450 F.3d 1072, 1080 (9th Cir. 2006).

In this case, the Service engaged in intra-agency conferencing and consultation on its revised rule for the experimental population of Mexican wolves and related section 10(a)(1)(A) permit authorizing take of Mexican wolves traveling north of Interstate 40. N043093. This resulted in the issuance of a biological opinion and finding that the revised rule and section 10(a)(1)(A) permit, as proposed, are "not likely to jeopardize the continued existence of the Mexican wolf." N043129. This "no jeopardy" finding is arbitrary and should be set aside for three reasons.

First, the Service's no-jeopardy finding is premised, in part, on the Mexican wolf's status as "nonessential," *see* N043129, which, as discussed above, is arbitrary and violates the ESA. *See supra* section I.A. The Service's nonessential determination was

not updated to reflect the Mexican wolf's new listing status and was not based on the best available biological factors, as required by the ESA.

Second, the Service's no-jeopardy finding failed to address and consider important aspects of the revised rule that will likely impact recovery efforts. For example, there is no mention or analysis of how the revised rule's: (a) population cap of 300-325 Mexican wolves; (b) restriction on the number of effective migrants (two every four years, maybe fewer); (c) prohibition on dispersal north of Interstate 40; and (d) new allowance for take in response to "unacceptable impacts" to wild ungulate herds, may impact the Mexican wolf's recovery. As discussed above, *see supra* section I.B., these are important aspects of the revised rule that will likely result in significant impacts to recovery efforts and, as such, should have been (but were not) discussed and analyzed before issuing a no-jeopardy finding. *See Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988) (rejecting biological opinion that failed to consider important aspects of the problem); *South Yuba River Citizens League v. NMFS*, 723 F. Supp.2d 1247, 1276 (E.D. Cal. 2010) (same).

Third, the Service's no-jeopardy finding fails to consider and analyze the best available science on the recovery needs of Mexican wolves. As discussed earlier, the published, peer-reviewed papers on topic, including Wayne and Hedrick (2010), Carroll (2006), and Carroll (2014) reveal at least three separate populations of Mexican wolves in the southwestern United States – connected to one another by dispersal – with each population simultaneously having at least 250 animals, are needed for recovery. N053227; N004187; R000181; C043056. This is the "minimum" necessary. N053227.

As discussed above, however, the revised rule's new provisions (i.e., the population cap of 300-325, restriction on the number of effective migrants to two per generation (every four years), prohibition on dispersal north of Interstate 40, and a new allowance of additional take in response to "unacceptable impacts to wild ungulate herds" undermine these recovery needs, *see supra* section I.B., and, as such, may jeopardize the continued existence of the subspecies in the wild. Indeed, according to the leading biologists, keeping the single population of Mexican wolves to only 300-325 – as proposed by the revised rule – shows a "relatively high extinction rate," long term decline in the population (assuming it does not go extinct), and increased genetic impoverishment. J015417-J015418. The Service admits as much, noting that a single population of Mexican wolves like the existing experimental population "can neither be considered viable nor self-sustaining." FR000175. Mexican wolves need more population growth, more effective migrants, more room to roam and disperse, and less human-caused take in order to recover in the wild, not less. *See* N053227. But the Service's no-jeopardy finding permits additional take of wolves and fails to consider and analyze the best available science on the recovery needs of Mexican wolves, including Wayne and Hedrick (2010), Carroll (2006), and Carroll (2014). This is arbitrary. *See National Wildlife Federation*, 524 F.3d at 934 (rejecting biological opinion for failing to adequately consider recovery needs of species).

## II.   The Service violated NEPA.

NEPA "promotes its sweeping commitment to 'prevent or eliminate damage to the environment' . . . by focusing Government and public attention on the environmental effects of proposed agency action." *Marsh v. ONRC*, 490 U.S. 360, 371 (1989).  By so doing, "NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Id.* "Ultimately, of course, it is not better documents but better decisions that count." 40 C.F.R. § 1500.1(c).

Under NEPA, the Service is required to prepare an EIS for any proposed federal action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2). An EIS must address, among other things, the environmental impacts (direct, indirect, and cumulative) of the proposed action and evaluate all reasonable alternatives. *Russell Country Sportsmen v. USFS*, 668 F. 3d 1037, 1045 (9th Cir. 2011) (citing 40 C.F.R. §§ 1508.8(b), 1502.14(a)). A draft EIS must be submitted for public review and comment before being finalized. 40 C.F.R. § 1503.1(a). Agencies are allowed to modify a proposed action in light of public comments received on a draft EIS but if the final action "departs substantially from the alternatives described in the draft EIS, a supplemental draft EIS is required. *Russell Country*, 668 F.3d at 1045. Here, the Service violated NEPA by: (a) failing to consider a reasonable range of alternatives; and (b) failing to prepare a supplemental EIS to address substantial changes made to the final action.

**A.      The Service failed to evaluate a reasonable range of alternatives.**

The alternatives analysis is "the heart" of an EIS because it presents "impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options." 40 C.F.R. § 1502.14. The alternatives analysis guarantees that agencies have before them and take into account "all possible approaches to a particular project (including total abandonment of the project) which would alter the environmental impact and the cost-benefit balance.'" *Bob Marshall Alliance v. Hodel*, 852 F. 2d 1223,1228 (9th Cir. 1988) (citations omitted). "Informed and meaningful consideration of alternatives . . . is thus an integral part of the statutory scheme" and "critical to the goals of NEPA." *Id.* at 1228-29. For this reason, NEPA directs all federal agencies "[r]igorously explore and objectively evaluate all reasonable alternatives" and, for alternatives eliminated from detailed study, "briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a). "An agency must look at every reasonable alternative, with the range dictated by the nature and scope of the proposed action, and sufficient to permit a reasoned choice." *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1038 (9th Cir. 2008). The purpose and  need of the proposed action dictates the scope of alternatives to be considered and analyzed. *Ilio Ulaokalani Coalition v. Rumsfeld*, 464 F.3d 1083, 1097 (9th Cir. 2006). An agency's failure to consider a reasonable alternative or provide an adequate justification for its omission, renders an EIS inadequate. *Southeast Alaska Conservation Council v. FHA*, 649 F.3d 1050, 1059 (9th Cir. 2011) (citations omitted).

Here, the Service's EIS failed to consider the viable and reasonable alternative of designating the newly listed subspecies of Mexican wolf "essential" pursuant to section 10(j) of the ESA. As discussed above, *see supra* section I.A., essential status is a reasonable alternative because it provides management flexibility and satisfies the stated purpose and need of the proposed action which is to further the Mexican wolf's "conservation by improving the effectiveness of the reintroduction project in managing the experimental population." FR000136; *see also* N067538 (same); FR000136 (same).

Indeed, in the draft EIS, the Service provides a list of criteria used to evaluate whether a proposed alternative meets the purpose and need of a proposed action. N067602. An alternative that designates the experimental population of Mexican wolves "essential" satisfies all of the criteria listed by the Service: essential status would contribute to persistence of the population, improve genetic variation, improve recruitment of wolves from the captive population, contribute to natural dispersal, provide flexibility for the reintroduction program, and facilitate the cooperation necessary to improve the recovery project's effectiveness. *See id.* By the Service's own definition and criteria, therefore, designating the experimental population of Mexican wolves essential satisfies the stated purpose and need of the proposed action. As such, it should have been (but was not) considered and analyzed in the EIS and the Service's failure to do so violates NEPA. *Southeast Alaska Conservation*, 649 F.3d at 1059.

This is especially true where the public requested the Service analyze an essential designation alternative, noting, in particular, that "re-designating the reintroduced

40

Mexican wolf population as essential . . . would allow the Service to require consultation under [section 7 of the ESA], thereby creating opportunities to place affirmative requirements for good livestock husbandry, coexistence, and conflict avoidance on users of public lands in the [experimental population area]." C042920.The Service did not respond to these or other comments on this proposed alternative in the final EIS. *See* N043067 – N043090; N058652. Nor does the Service explain why the alternative was eliminated from consideration. *See* N067602.

In an earlier, preliminary draft of the "comment/response matrix," the Service includes the public's request to consider the essential status alternative, *see* N058652, but it was never addressed in the final EIS or record of decision (ROD), *see* N034615-N034622. This is a violation of NEPA. The Service should have analyzed the essential status alternative, or at the very least, provided adequate justification for why it eliminated the alternative from detailed study. 40 C.F.R. § 1502.14(a); *Southeast Alaska Consvt'n Council*, 649 F.3d at 1059.

## B.     The Service failed to prepare a supplemental draft EIS.

NEPA authorizes the Service to modify a proposed action in response to public comments received on a draft EIS. *Russell Country*, 668 F.3d at 1045. "[A]gencies must have some flexibility to modify alternatives canvassed in the draft EIS to reflect public input." *Id*. But if the final action "departs significantly from the alternatives described in the draft EIS" then a supplemental draft EIS is required. *Id*. "Agencies . . . [s]hall prepare supplements to either draft or final environmental impact statements if . . . [t]he agency

41

makes substantial changes in the proposed action that are relevant to environmental concerns . . ." 40 C.F.R. § 1502.9(c). The Council for Environmental Quality's (CEQ's) *Forty Most Asked Questions Concerning NEPA Regulations*, 46 Fed. Reg. 18026, 18035 (March 23 1982), explains supplementation is required if: (1) the new action is more than a "minor variation of one of the alternatives discussed in the draft EIS"; or (2) the new action is not "qualitatively within the spectrum of alternatives that were discussed in the draft [EIS]." *Russell Country,* 668 F.3d at 1045 (citing *Forty Questions*).[10]

In this case, supplementation is required because the Service's eleventh hour decision to: (1) cap the experimental population of Mexican wolves at 300-325; (2) adopt a complicated phased management approach for releases in western Arizona; and (3) adopt a new definition of "unacceptable impacts to a wild ungulate herd" are substantial changes that are neither "minor variations" of the alternatives discussed in the draft EIS nor "qualitatively within the spectrum of alternatives" considered in the draft EIS. *Russell Country,* 668 F.3d at 1045; *Forty Questions*, 46 Fed. Reg. at 18035.

In the draft EIS, for instance, there is no mention of a population cap, *see* FR000087 and N042671, so the concept was never submitted for public review and comment or subjected to peer review. *See* C085862; C085818 – C085819. This conflicts with NEPA's instruction that EISs provide the public with "sufficient information to permit 'meaningful consideration' of an action under agency review." *California v.*

---

[10] In *Russell Country*, the Ninth Circuit joined the First, Eight, and Tenth Circuits in adopting CEQ's *Forty Questions* as a framework for applying 40 C.F.R. § 1502.9(c). *See* 668 F.3d at 1045.

*Block*, 690 F.2d 753, 772 (9th Cir. 1982). An EIS "should serve both to alert the public of what the agency intends to do and give the public enough information to be able to participate intelligently in the EIS process." *Id.* The draft EIS at issue here did neither. In fact, in the draft EIS, the Service expressly disavowed the use of "hard caps" on population size or "fixed population objectives" because they would hinder conservation efforts.  According to the Service, a population cap coupled with removal of wolves should the population exceed the "maximum numerical target, would constrain rather than provide needed flexibility to the reintroduction project in making decisions related to the release, translocation, take and removal of Mexican wolves." N067610. Setting "fixed population objectives" would not further conservation efforts. *Id.*; *see also* N057673 (cap not appropriate); N074315 (there will be "no upper bound" on population numbers).

In the final EIS, however, the Service did an about-face and substantially changed its approach by setting a population cap of 300-325 Mexican wolves. FR000187; N042672. This eleventh hour change, which could not have been anticipated based on the alternatives included in the draft EIS, was made for political (not biological) reasons as part of a closed-door agreement with Arizona. *See* J014093. The change is neither a "minor variation" of alternatives described in the draft EIS nor "qualitatively within the spectrum" of alternatives described in the draft EIS. Instead, it is a significant departure from the alternatives disclosed in the draft EIS and one that, according to the best available science, will likely undermine recovery efforts. *See* J015415-J015416; N053227. As such it should have been (but was not) disclosed in the draft EIS.

43

The same is true with respect to the Service's last minute decision to implement a phased management approach for Mexican wolf releases in Arizona and to adopt a new definition of "unacceptable impacts to wild ungulate herds" that permits additional human-caused mortality. *See* FR000187; FR000185. These changes are not mentioned or addressed in the draft EIS and both changes are substantial. The phased management approach restricts where Mexican releases and translocations can occur in Arizona and prohibits Mexican wolf dispersal to specific areas at certain times (e.g., limiting dispersal west of Highway 87). FR000187-FR00091. Likewise, the new definition of "unacceptable impacts to wild ungulate herds" gives Arizona and New Mexico broad authority to determine when "unacceptable" impacts occur and allows additional take even though human-caused mortality and removal of Mexican wolves from the wild is already too high. *See* N053227, N042670. As discussed earlier, this new take provision will only make a bad situation worse.

These three changes, therefore –i.e., the population cap, phased management, and new take definition– should have been disclosed in the draft EIS for public review and comment. They are not "minor variations" presented in the draft EIS. Nor are they qualitatively within the spectrum of alternatives included in the draft EIS. Indeed, the Service concedes as much, noting that it made "'substantive' changes . . . by incorporating suggested elements such as establishing a population objective of 300-325 Mexican wolves, adopting a phased management approach, and adding a definition of

44

unacceptable impacts to wild ungulate herds." N034622. Thesechanges are "substantive in nature in that they made actual (as opposed to superficial) changes . . ." *Id*.

The Service thus admits that the changes are substantial, non-minor changes to the alternatives discussed in the draft EIS. As substantive changes, they present "wholly new problems" and impacts never previously considered by the Service in the draft EIS, or considered by the public. *Russell Country*, 668 F.3d at 1049 n. 15 (citation omitted); *see also California*, 690 F.2d at 772 (requiring supplementation when the final EIS "differed sufficiently" from draft EIS and deprived public of opportunity to submit meaningful comments). Supplementation is "therefore required." *Russell Country*, 668 F.3d at 1049 n. 15.  Although the Service asserts that supplementation is not required because the purpose and need from the draft to the final EIS remained "unchanged," this is not the test. N034622. Regardless of whether the purpose and need remains unchanged, if the chosen alternative goes through substantial changes – changes that are more than "minor variations" or not qualitatively within the spectrum of alternatives discussed in the draft EIS – then supplementation is required. *Russell Country*, 668 F.3d at 1045.

## CONCLUSION

For the forgoing reasons, Plaintiffs respectfully request this Court grant their motion for summary judgment, declare the Service violated the ESA and NEPA as described above, set aside portions of the revised rule, portions of the section 10(a)(1)(A) permit, and the biological opinion challenged herein, and remand this matter back to the Service for further proceedings and analysis in accordance with this Court's order.

45

Respectfully submitted this 23rd day of February, 2016.

/s/ Matthew K. Bishop
Matthew K. Bishop, *admitted pro hac vice*
Western Environmental Law Center
103 Reeder's Alley
Helena, MT 59601
(406) 324-8011 (tel.)
(406) 443-6305 (fax)
bishop@westernlaw.org

/s/ John Mellgren
John R. Mellgren, *admitted pro hac vice*
Western Environmental Law Center
1216 Lincoln Street
Eugene, OR 97401
(541) 359-0990 (tel.)
(541) 485-2457
mellgren@westernlaw.org

/s/ Sarah K. McMillan
Sarah K. McMillan, *admitted pro hac vice*
WildEarth Guardians
P.O. Box 7516
Missoula, MT 59807
(406) 549-3895
smcmillan@wildearthguardians.org

Judith Calman, admitted *pro hac vice*
New Mexico Wilderness Alliance
142 Truman St. NE, Suite B-1
Albuquerque, New Mexico 87108
Ph: (505) 843-8696
judy@nmwild.org

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of February, 2016, I filed a copy of this document electronically through the CM/ECF system, which caused all ECF registered counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

/s/ Matthew Bishop
Matthew Bishop