**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Center for Biological Diversity, et al., | No. CV-15-00019-TUC-JGZ (l) |
| Plaintiffs, | No. CV-15-00179-TUC-JGZ (c) |
| | No. CV-15-00285-TUC-JGZ (c) |
| v. | |
| Sally Jewell, et al., | **ORDER** |
| Defendants. | |
| Safari Club International, et al. | |
| Plaintiffs, | No. CV-16-00094-TUC-JGZ |
| v. | **ORDER** |
| Sally Jewell, et al., | |
| Defendants. | |

On January 16, 2015, the United States Fish and Wildlife Service (FWS) published a final agency action entitled "Revision to the Regulations for the Nonessential Experimental Population of the Mexican Wolf," pursuant to Section 10(j) of the Endangered Species Act, 16 U.S.C. § 1539. The 2015 "10(j) rule" sets forth FWS's procedures for the release, dispersal, and management of the only existing wild population of Mexican gray wolves in the United States. In the litigation presently before this Court, four sets of Plaintiffs seek to set aside the 10(j) rule and related agency actions as arbitrary and capricious under the Administrative Procedure Act, 5 U.S.C. §

706(2)(A).[1] Plaintiffs each allege that, in promulgating the 10(j) rule, Federal Defendants violated the Endangered Species Act, 16 U.S.C. § 1531, *et seq.*, and the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.*

Currently pending before the Court are twelve related cross-motions for summary judgment, filed by the Plaintiffs, Federal Defendants, and Defendants-Intervenors in the above captioned consolidated cases and in related case No. CV-16-00094-TUC-JGZ.[2] The motions are fully briefed. Oral argument was held on April 26, 2017. After

[1] Case No. CV-15-00019-TUC-JGZ was filed by Plaintiffs Center for Biological Diversity, *et al.* (collectively, "CBD"), on January 16, 2015. (Doc. 1.) Case No. CV-15-00179-TUC-JGZ was filed by Plaintiffs Arizona and New Mexico Coalition of Counties for Economic Growth, *et al.* (collectively, "the Coalition"), in the District of New Mexico on February 12, 2015, and transferred to the District of Arizona on April 28, 2015. (Doc. 29.) It was consolidated with Case No. CV-15-00019-TUC-JGZ on May 12, 2015. (Doc. 35.) Case No. CV-15-00285-TUC-JGZ was filed by Plaintiffs WildEarth Guardians, *et al.* (collectively, "WEG"), on July 2, 2015, and consolidated with the aforementioned cases on July 20, 2015. (Doc. 58.) The Court consolidated these three cases for the purposes of discovery and case management only. Filings for these cases can be found in the docket for lead case No. CV-15-00019-TUC-JGZ.

Case No. CV-16-00094-TUC-JGZ was filed by Plaintiffs Safari Club International, *et al.* (collectively, "SCI"), on October 16, 2015 in the District of Arizona. Due to the differing stages of litigation, the Court declined to consolidate case No. CV-16-00094-TUC-JGZ with the three earlier cases. (Doc. 120.) While case No. CV-16-00094-TUC-JGZ is substantively related to the earlier cases, it retains its own docket. Throughout this Order, citations to docket entries refer to documents filed in lead case No. CV-15-00019-TUC-JGZ, unless otherwise noted.

[2] The cross-motions for summary judgment, memoranda and statements of facts in case No. CV-15-00019-TUC-JGZ are filed at docs. 114, 115, 116 (Plaintiff CBD); 123, 124, 125, 126 (Federal Defendants); and 129, 130, 131, 132 (Defendant-Intervenor State of Arizona). The cross-motions for summary judgment, memoranda, and statements of facts in case No. CV-15-00179-TUC-JGZ are filed at 108, 109, 110 (Plaintiff the Coalition); 137, 138, 139, 140 (Federal Defendants); and 147, 148, 149 (Defendant-Intervenor CBD). The cross-motions for summary judgment, memoranda and statements of facts in case No. CV-15-00285-TUC-JGZ are filed at docs. 111, 112, 113 (Plaintiff WEG); 133, 134, 135, 136 (Federal Defendants); and 141, 142, 143, 144 (Defendant Intervenor State of Arizona). The cross-motions for summary judgment, memoranda and statements of facts in case No. CV-16-00094-TUC-JGZ are filed in that case's docket at docs. 67, 68, 69 (Plaintiff SCI); 70, 71, 72, 73 (Federal Defendants); and 78, 79 (Defendant-Intervenor CBD).

consideration of the parties' arguments and the administrative record in this case, and for the reasons discussed herein, the Court will grant the motions in part, deny the motions in part, and remand this matter to FWS for further consideration consistent with this Order.

## STANDARDS OF REVIEW

### I.      Summary Judgment

Summary judgment is appropriate if the pleadings and supporting documents "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A court presented with cross-motions for summary judgment should review each motion separately, giving the nonmoving party for each motion the benefit of all reasonable inferences from the record. *Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles Cnty. Sheriff Dep't*, 533 F.3d 780, 786 (9th Cir. 2008). "Summary judgment is a particularly appropriate tool for resolving claims challenging agency action." *Defenders of Wildlife v. Salazar*, 729 F. Supp. 2d 1207, 1215 (D. Mont. 2010). In such cases the Court's role is not to resolve facts, but to "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985).[3]

//

---

[3] Several of the parties filed controverting statements of facts. (*See* docs. 128, 132, 136, 140, 144, 149, 154, 156, 157; docs. 83, 84 in case No. CV-16-00094-TUC-JGZ.) Upon review, the Court concludes that the facts are not in dispute; rather, the parties dispute the legal significance of the facts. The content and accuracy of the administrative record is also undisputed. Therefore, this case is appropriate for resolution by summary judgment. *See Occidental Eng'g Co.*, 753 F.2d at 769-70 (noting that in its review of an administrative proceeding the district court decides the legal question of whether the agency could reasonably have found the facts as it did).

The Amended Administrative Record (AR) in the above-captioned consolidated cases is identical to the Administrative Record filed in related case No. CV-16-00094-TUC-JGZ. (*See* doc. 100; docs. 39–41 in case No. CV-16-00094-TUC-JGZ.) Many of the AR documents cited by the Court are also published in the Federal Register or codified in the Code of Federal Regulations. For the purposes of setting forth the undisputed facts, the Court has elected to include only the AR citation.

- 3 -

## II.     The Administrative Procedure Act

Judicial review of agency actions under the Endangered Species Act and the National Environmental Policy Act is governed by the Administrative Procedure Act (APA). *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002). Under APA Section 706(2), the court may set aside agency action where it is found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with applicable law. 5 U.S.C. § 706(2)(A). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In order to determine whether an agency action is arbitrary and capricious, a reviewing court looks to the evidence the agency has provided to support its conclusions, along with other materials in the record, to ensure the agency made no clear error of judgment. *See Judulang v. Holder*, 565 U.S. 42, 52–53 (2011); *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008), *overruled on other grounds by Am. Trucking Assns., Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). That task involves examining the reasons for agency decisions, which must be based on non-arbitrary, relevant factors that are tied to the purpose of the underlying statute. *See Judulang*, 565 U.S. at 53, 55. The agency must articulate a rational connection between the facts found and the choice made. *Forest Guardians v. United States Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir. 2003). Post hoc explanations of agency action by appellate counsel cannot substitute for the agency's own articulation of the basis for its decision. *Arrington v. Daniels*, 516 F.3d 1106, 1113 (9th Cir. 2008) (citing *Fed. Power Comm'n v. Texaco, Inc.*, 417 U.S. 380, 397 (1974)). Similarly, the reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs.*

*Ass'n*, 463 U.S. at 43. Rather, the court's review is "limited to the explanations offered by the agency in the administrative record." *Arrington*, 516 F.3d at 1113.

"The arbitrary and capricious standard is 'highly deferential, presuming the agency action to be valid and [requires] affirming the agency action if a reasonable basis exists for its decision.'" *Kern Cty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006) (quoting *Indep. Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000)). When examining scientific determinations, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential. *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983). This is particularly true when the scientific findings are within the agency's area of expertise. *See Lands Council*, 537 F.3d at 993. Moreover, "[w]hen not dictated by statute or regulation, the manner in which an agency resolves conflicting evidence is entitled to deference so long as it is not arbitrary and capricious." *Trout Unlimited v. Lohn*, 559 F.3d 946, 958 (9th Cir. 2009).

Nevertheless, the APA requires a "substantial inquiry" to determine whether the agency acted within the scope of its authority. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Thus, although the agency is entitled to a "presumption of regularity," the effect of that presumption is not to shield the agency's action from a "thorough, probing, in-depth review," and the court's inquiry into facts should be "searching and careful." *Id.*

## STATUTORY BACKGROUND

### I. The Endangered Species Act

Passed in 1973, the Endangered Species Act (ESA or "the Act"), 16 U.S.C. § 1531, *et seq.*, sets forth a comprehensive scheme for the protection of endangered and threatened species in the United States. *Cal. ex rel. Lockyer v. United States Dep't of Agric.*, 575 F.3d 999, 1018 (9th Cir. 2009). Under the ESA, the Secretary of the Interior must identify endangered species, designate their critical habitats, and develop and implement recovery plans. *Natural Res. Def. Council, Inc. v. United States Dept. of*

*Interior*, 13 F. App'x 612, 615 (9th Cir. 2001). An "endangered species" is a species or subspecies which is "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6), (16). A "threatened species" is a species or subspecies that "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20). The Secretary's duties under the ESA are delegated to FWS pursuant to 50 C.F.R. § 402.01(b).

Described by the Supreme Court as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation," the ESA reflects Congress's desire "to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). Congress pronounced the purpose of the ESA to be the conservation of listed species and the ecosystems upon which they depend, 16 U.S.C. § 1531(b), and declared a policy that all federal agencies shall utilize their authorities in furtherance of this purpose. 16 U.S.C. § 1531(c)(1). Thus, the ESA "reflects a conscious decision by Congress" to give listed species primacy over the primary missions of federal agencies, *Lockyer*, 575 F.3d at 1018, and to afford those species "the highest of priorities." *Or. Natural Res. Council v. Allen*, 476 F.3d 1031, 1033 (9th Cir. 2007).

"Conservation," also referred to as "recovery," is at the heart of the ESA. Conservation is defined as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided [by the ESA] are no longer necessary." *Sierra Club v. United States Fish & Wildlife Serv.*, 245 F.3d at 438 (citing 16 U.S.C. § 1532(3)). It is the "process that stops or reverses the decline of a species and neutralizes threats to its existence." *Ctr. for Biological Diversity v. Kempthorne*, 607 F. Supp. 2d 1078, 1088 (D. Ariz. 2009) (quoting *Defenders of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 131 (D.D.C. 2001)).[4] The ESA's

---

[4] "Recovery" is defined in the implementing regulations as the "improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in section 4(a)(1) of the Act." 50 C.F.R. § 402.02. For the purposes of this Order, the Court uses the terms "conservation" and "recovery" interchangeably.

conservation purpose "is reflected not only in the stated policies of the Act, but in literally every section of the statute." *Babbitt v. Sweet Home Chapter of Cmties. for a Great Or.*, 515 U.S. 687, 699 (1995) (quoting *Hill*, 437 U.S. at 184); *see also Red Wolf Coal. v. United States Fish & Wildlife Serv.*, 210 F. Supp. 3d 796, 803 (E.D.N.C. 2016).

In carrying out its conservation mandate, FWS must consider the long term viability of the species. To this end, the agency may not ignore recovery needs and focus entirely on survival. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 932 (9th Cir. 2008). Rather, recovery envisions self-sustaining populations that no longer require the protections or support of the Act. *Gifford Pinchot Task Force v. United States Fish and Wildlife Serv.*, 378 F.3d 1059, 1070 ("[T]he ESA was enacted not merely to forestall the extinction of species (i.e., promote a species survival), *amended*, 387 F.3d 968 (9th Cir. 2004), but to allow a species to recover to the point where it may be delisted."); *Sierra Club v. United States Fish & Wildlife Serv.*, 245 F.3d 434, 438 (5th Cir. 2001) ("[T]he objective of the ESA is to enable listed species not merely to survive, but to recover from their endangered or threatened status.").

In addition, the agency must determine recovery based on the viability of species, not in captivity but in the wild. "In enacting the Endangered Species Act, Congress recognized that individual species should not be viewed in isolation, but must be viewed in terms of their relationship to the ecosystem of which they form a constituent element." H.R. Conf. Rep. No. 97-835, at 30 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2860, 2871; H.R. Rep. 95-1625, at 5 (1978), *reprinted in* 1978 U.S.C.C.A.N. 9453, 9455 (purpose of ESA is not only to reduce threats to the species' existence, but "to return the species to the point where they are viable components of their ecosystems."). Or, as the Ninth Circuit explained, "the ESA's primary goal is to preserve the ability of natural populations to survive in the wild." *Trout Unlimited*, 559 F.3d at 957; *accord Cal. State Grange v. Nat. Marine Fisheries Serv.*, 620 F. Supp. 2d 1111, 1156–57 (E.D. Cal 2008). Thus, while the agency may rely on captive populations to reestablish a species in the wild, the goal of recovery is "to promote populations that are self-sustaining without

human interference." *Trout Unlimited*, 559 F.3d at 957.

The ESA contains multiple sections, each governing a piece of the Act's comprehensive scheme for the listing, management, and protection of endangered species. Sections 10(j) and 10(a)(1) are relevant to the Court's conclusions herein and are summarized below.

### A.    Section 10(j): Experimental Populations

In 1982, Congress amended the ESA to include Section 10(j), 16 U.S.C. § 1539(j), which established procedures for the designation and management of "experimental populations." 49 Fed. Reg. 33,885, 33,885 (Aug. 27, 1984). Under Section 10(j), the Secretary of the Interior may authorize the release of an experimental population of an endangered species outside the species' current range if the Secretary determines that the release will further the conservation of that species. *See* 16 U.S.C. § 1539(j). An "experimental population" is defined as "any population (including any offspring arising solely therefrom) authorized by the Secretary for release . . . , but only when, and at such times as, the population is wholly separate geographically from nonexperimental populations of the same species." *Id.* § 1539(j)(1). Once designated, an experimental population is treated as "threatened" under the Act, irrespective of the species' designation elsewhere. 50 C.F.R. § 17.82; s*ee* 49 Fed. Reg. at 33,885.

A Section 10(j) rule is issued in accordance with the APA, which affords the benefit of public comment and serves to address the needs of each particular population proposed for designation. *Wyo. Farm Bureau Fed'n v. Babbitt*, 199 F.3d 1224, 1232 (10th Cir. 2000) (citing H.R. Conf. Rep. No. 97-835 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2860, 2875); 49 Fed. Reg. at 33,886. Before releasing an experimental population under Section 10(j), the Secretary must also develop regulations identifying the experimental population, 16 U.S.C. § 1539(j)(2)(B), the geographic area where the regulations apply, 50 C.F.R. § 17.81(c)(1), and the specific management restrictions that apply to the population. *Id.* § 17.81(c)(3). The regulations are species-specific and are developed on a case-by-case basis. 49 Fed. Reg. at 33,886. Once the regulations are

finalized and published, the management and conservation of the population is then carried out by FWS in conjunction with other management agencies, including county, state, tribal, and federal entities, often pursuant to a memorandum of understanding signed by all parties. *Id.*

Before designating an experimental population, the Secretary must make two specific findings. *United States v. McKittrick*, 142 F.3d 1170, 1176 (9th Cir. 1998). First, an experimental population may only be released if the Secretary finds the release will "further the conservation of [the] species." 16 U.S.C. § 1539(j)(2)(A). Factors that must be considered by the Secretary in making this finding include:

> (1) Any possible adverse effects on extant populations of a species as a result of removal of individuals, eggs, or propagules for introduction elsewhere;
> (2) The likelihood that any such experimental population will become established and survive in the foreseeable future;
> (3) The relative effects that establishment of an experimental population will have on the recovery of the species; and
> (4) The extent to which the introduced population may be affected by existing or anticipated Federal or State actions or private activities within or adjacent to the experimental population area.

50 C.F.R. § 17.81(b). The Secretary is required to make this determination using the best scientific and commercial data available. *Id.*

Second, prior to releasing an experimental population, the Secretary must determine whether the population is essential to the continued existence of the species in the wild. 16 U.S.C. § 1539(j)(2)(B); *see also* 50 C.F.R. § 17.81(c)(2). "Essential" means the experimental population's loss "would be likely to appreciably reduce the likelihood of the survival of the species in the wild." 50 C.F.R. § 17.80(b). All other populations are to be classified as "nonessential." *Id.* The essentiality finding must be "based solely on the best scientific and commercial data available, and the supporting factual basis[.]" *Id.* § 17.81(c)(2). Congress anticipated that in most cases experimental populations would be nonessential. S. Rep. No. 97-418, at 9 (1982). This is because the loss of a single experimental population will rarely appreciably reduce the likelihood of the entire

species' or parent populations' survival in the wild. *See* 49 Fed. Reg. at 33,888. Whether a population is designated "essential" or "nonessential" affects whether federal agencies have a duty to consult with FWS on certain federal actions under ESA Section 7(a)(2). Where a population is designated "nonessential," federal agencies are not required to formally consult with FWS on actions likely to jeopardize the continued existence of the species. 16 U.S.C. § 1536(a)(2). Instead, federal agencies must engage in a conferral process that results in conservation recommendations that are not binding upon the agency. *Id.* § 1536(a)(4). Additionally, the Secretary may not designate critical habitat for an experimental population designated as nonessential. *Id.* § 1539(j)(2)(C)(ii). To date, the "essential" designation has never been applied to an experimental population of any species. *See* 50 C.F.R. §§ 17.11, 17.84.

As with the other provisions of the ESA, conservation and recovery are at the heart of Section 10(j). *See Defs. of Wildlife v. Tuggle*, 607 F. Supp. 2d 1095, 1117 (D. Ariz. 2009) ("USFWS has a non-discretionary duty to ensure that the Final Rule for the Reintroduction Program, 50 C.F.R. § 17.84(k), provides for conservation of the Mexican Wolf."). Congress enacted Section 10(j) in 1982 as a means of giving greater administrative flexibility to the Secretary in managing reintroduced species. Although Section 10(j) permits the Secretary to treat the species as threatened, irrespective of the species' designation elsewhere, 49 Fed. Reg. at 33,886, 33,889, Congress believed that this flexibility would facilitate the reintroduction effort and enhance recovery efforts. *See* H.R. Rep. No. 97-567, at 33 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2807, 2833; 49 Fed. Reg. at 33,887–88; *McKittrick*, 142 F.3d at 1174 (management flexibility afforded under Section 10(j) "allows the Secretary to better conserve and recover endangered species"). The use of Section 10(j) was accordingly limited to "those instances where the involved parties are reluctant to accept the reintroduction of an endangered or threatened species without the opportunity to exercise greater management flexibility on the introduced population." 49 Fed. Reg. at 33,888–89. Even in such cases, the experimental designation would only be applied when "necessitated by the conservation and recovery needs of a

listed species," and an experimental designation based on nonconservation purposes would not be supported. *Id.* at 33,889.

## B. Section 10(a)(1): Permits

Under Section 10(a)(1)(A) of the ESA, the Secretary may permit actions otherwise prohibited by Section 9 of the Act for scientific purposes or to enhance the propagation or survival of the affected species. 16 U.S.C. § 1539(a)(1)(A). The Secretary's authority includes issuing permits for actions necessary for the establishment and maintenance of experimental populations. *Id.* The permits may authorize lethal or nonlethal "take," which means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). As with the other provisions of the Act, the issuance of individual permits must not conflict with recovery of the species as a whole. "[T]he Secretary is subject to the requirement of Section 10(d) that issuance will not operate to the disadvantage of the listed species," and the permit issued must be consistent with the ESA's conservation purpose and policy. S. Rep. No. 97-418 at 8; 16 U.S.C. § 1539(d).

## FACTUAL BACKGROUND

A subspecies of the gray wolf, the Mexican gray wolf or "Mexican wolf" (*Canis lupus baileyi*) is native to the forested and mountainous terrain of the American Southwest and northern Mexico. (Revision to the Regulations for the Nonessential Experimental Population of the Mexican Wolf (January 16, 2015), AR FR000136 at FR000138 (hereinafter 2015 10(j) Rule).) The Mexican wolf is relatively small, weighing between 50 and 90 pounds and measuring up to six feet in length. It is patchy black, brown, cinnamon, and cream in color. (*Id.*) It is the rarest and most genetically distinct subspecies of all the North American gray wolves. (Final Environmental Impact Statement (Nov. 25, 2014), AR N042613 at N042617 (hereinafter FEIS).) A wanderer and a forager, Mexican wolves may roam across many square miles of available habitat. (1982 Mexican Wolf Recovery Plan, R000887 at R000894, R000905 (hereinafter 1982 RP).) The Mexican wolf preys principally on elk and other wild ungulates, but will also

eat small mammals or birds and prey or scavenge on livestock. (*Id* at R000894; 2015 10(j) Rule at FR000138.)

Though historically numbering in the thousands, by the 1970s the Mexican wolf hovered on the brink of extinction. (2015 10(j) Rule at FR000138.) Like other North American wolves, the Mexican wolf was much maligned during the twentieth century, due to "its reputation as a livestock killer." (Establishment of a Nonessential Experimental Population of the Mexican Wolf in Arizona and New Mexico (January 12, 1998), AR FR000001 at FR000001 (hereinafter 1998 10(j) Rule).) In the American Southwest, concerted eradication efforts by both public and private entities commenced around the turn of the century, resulting in a rapid reduction in Mexican wolf numbers. (*See* 1982 RP at R000895–96; 2010 Conservation Assessment, AR N052264 at N052283 (hereinafter 2010 CA).) By the 1920s the Southwest's population of resident wolves had been reduced to "a very few scattered individual predators." (1982 RP at R000896.) Though occasionally wolves reappeared in Arizona and New Mexico, the product of migration from Mexico, "increasingly effective poisons and trapping techniques during the 1950s and 1960s" effectively eliminated remaining wolves north of the Mexican border. (2010 CA at N052283-84; 1982 RP at R000896.) "No wild wolf has been confirmed since 1970," and the subspecies was thought to be completely extirpated from its historic range by the 1980s. (2015 10(j) Rule at FR000138.)

In the late 1970s and early 1980s, the United States and Mexico formally commenced efforts to save the Mexican wolf from extinction. (2014 FEIS at N042655–56.) In 1976, the Mexican wolf was first listed under the ESA as an endangered subspecies.[5] (2015 10(j) Rule at FR000137.) In 1977, a binational program aimed at

---

[5] In 1978, the subspecies listing was subsumed by the designation of the entire gray wolf species as endangered throughout North America, with the exception of Minnesota, where the species was listed as threatened. In 2015, the Mexican wolf was again listed as an endangered subspecies. *See* 80 Fed. Reg. 2488 (Jan. 16, 2015); 50 C.F.R. § 17.11(h). In spite of the changes in legal designation, the Mexican wolf has continuously been recognized as a separate subspecies for the purposes of research and conservation. (*See* 2015 10(j) Rule at FR000137.)

growing and maintaining a captive population of Mexican wolves was initiated, and in 1981 captive breeding officially began. (*See id.* at FR000139; 1998 10(j) Rule at FR000002; 2010 CA at N052270.) All Mexican wolves alive today originated from the seven founding wolves that by 1980 constituted the last of the subspecies. (*See* FEIS at N042656.)

### *1982 Recovery Plan*

In 1982, in accordance with Section 4(f) of the ESA, FWS published the first Mexican Wolf Recovery Plan, which created a five-part step-down plan for the implementation of the captive breeding program and the eventual reestablishment of wolf populations in the wild. (*See* 1982 RP at R000887, *et seq.*) Written against a backdrop of near-extinction, the 1982 Recovery Plan did not provide criteria for delisting the Mexican gray wolf. (*Id.* at R000913; 2010 CA at N052270; 2015 10(j) Rule at FR000138.) Rather, the recovery team determined that the more "realistic" course of action was to set a limited goal of ensuring the wolf's survival by "re-establishing a viable, self-sustaining population of at least 100 Mexican wolves in the middle to high elevations of a 5,000-square-mile area within the Mexican wolf's historic range." (1982 RP at R000913; *see also* Mexican Wolf Blue Range Reintroduction Project 5-Year Review (Dec. 31, 2005), AR N000556 at N000574 (hereinafter 5-Yr Review).) At that time, the reintroduction of the subspecies to the wild was seen as a remote possibility, to be taken in the "unseeable future," and the recovery team's recommendations were accordingly made with the caveat that future revisions to the plan would be necessary to fully implement reintroduction and recover the species. (*See* 1982 RP at R000891.)

Over the next several decades, FWS continued to breed wolves in facilities throughout the United States and Mexico. (*See, e.g.*, 2015 10(j) Rule at FR000139.) Though by 1997 the captive population had grown to 148 wolves, no wolves had been released back into the wild, due in large part to controversy surrounding reintroduction. (5-Yr Review at N000559.) As FWS noted, the Mexican wolf reintroduction was "prominent in the American public's eye" long before reintroduction plans formally

commenced. (*Id.*) The questions of "[w]hether reintroduction and recovery should be allowed, and if so where and how, were hotly debated through the 1990s[.]" (*Id.*) Eventually, in response to litigation against FWS by seven environmental organizations for failure to implement provisions of the ESA, FWS finalized a Section 10(j) rule to reintroduce the Mexican wolf to the wild. (*See* 2010 CA at N052285.)

### *1998 10(j) Rule*

Like the 1982 Recovery Plan, the 1998 10(j) rule did not purport to set forth criteria sufficient for the recovery of the Mexican wolf. Rather, consistent with the 1982 Recovery Plan, the goal of the 1998 rule was to restore a self-sustaining population of 100 Mexican wolves to the wild. (1998 10(j) Rule at FR000001; 2010 CA at N052286; Mexican Wolf Recovery: Three-Year Program Review and Assessment (June 2001), AR N046730 at N046737 [hereinafter 3-Yr Review].) This number was deemed a "starting point to determine whether or not [FWS] could successfully establish a population of Mexican wolves in the wild that would conserve the species and lead to its recovery." (2015 10(j) Rule at FR000150.) As in years prior, FWS anticipated that recovery objectives, including a population goal sufficient for delisting, would be defined in a future, revised recovery plan. (*Id.* at FR000002.)

In March 1998, pursuant to the 1998 10(j) rule, eleven wolves were released into the Blue Range Wolf Recovery Area (BRWRA), constituting the first reintroduction of the subspecies into the wild. (*See* 1998 10(j) Rule at FR000003.) The rule designated the population as "nonessential experimental" and set forth management directives for the population. (*Id.*) The rule contemplated that 14 family groups of wolves would be released over the course of five years into the BRWRA, a 6,854 square-mile stretch of primarily national forest land spanning central Arizona and New Mexico. (*Id.* at FR000003.) The BRWRA was contained within the larger Mexican Wolf Experimental Population Area (MWEPA), which was a geographic area used to identify members of the population; the MWEPA was not designated as an area for release or translocation of wolves. (*Id.* at FR000002.) Although the 1998 10(j) rule set a population goal of 100

wolves, authorized agencies could take, remove, or translocate wolves in specified circumstances, and private citizens were given "broad authority" to harass wolves for purposes of scaring them away from people, buildings, pets, and livestock. (*Id.* at FR000003–04.) Killing or injuring wolves was permitted in defense of human life or livestock. (*Id.*)

In the 1998 rule, FWS designated the experimental population as "nonessential." (*Id.* at FR000004.) FWS found that the nonessential designation was appropriate because only genetically "redundant" wolves from the captive breeding program would be released into the wild. FWS reasoned that the loss of the experimental population would not significantly affect the likelihood of the survival of the captive population, and that this was true, even though the total population of the subspecies would not constitute a minimum viable population under conservation biology principles. (*Id.* at FR000005-06; 2010 CA at N052286.) FWS also found that the "nonessential" designation was necessary to obtain needed state, tribal, local, and private cooperation and would allow for additional "management flexibility" in response to negative impacts, such as livestock depredation. (1998 10(j) rule at FR000004; 2010 CA at N052286.) Without such flexibility, FWS reasoned, intentional illegal killing of wolves likely would harm the prospects for success. (*Id.*) FWS indicated that it did not intend to change the population's status to "essential" and could foresee "no likely situation which would result in such changes in the future." (1998 10(j) rule at FR000004; *see also* 2010 CA at N052286.)

### *Identification of the Need for Improvement to Wolf Recovery*

Over the next 17 years, with no published recovery criteria in place, the Mexican wolf recovery and reintroduction programs continued to be implemented in accordance with the 1982 Recovery Plan and the 1998 10(j) Rule. Progress toward the 100-wolf population goal was slower than anticipated (*see* FEIS at N042671; 2015 10(j) Rule at FR000175), and efforts to improve the program's regulatory framework were largely

unsuccessful.[6] (*See* 2010 CA at N052273; 3-Yr Review at N046797-N046804.) Public opposition to the reintroduction program remained strong.[7] By the time FWS published its 2010 Conservation Assessment, there had been no formal changes to the reintroduction program, and the agency again noted the need for regulatory improvements. (*See* 2010 CA at N052273.) Although in the 2010 Conservation Assessment, FWS determined that public opinion was not a threat to the Blue Range population, illegal shooting of wolves remained the single greatest source of wolf mortality in the reintroduced population, accounting for almost half of all deaths between 1998 and June 1, 2009. (*Id.* at N052273–74.)

Meanwhile, efforts to revise the 1982 Mexican Wolf Recovery Plan were similarly unsuccessful. FWS convened teams to revise the recovery plan in the early 1990s and early 2000s, but without success. (1998 10(j) Rule at FR000002; 5-Yr Review at N000559; 2010 CA at N052270–71.) In 2010, FWS convened a third wolf recovery team. (*See* Draft Mexican Wolf Revised Recovery Plan, AR C043009, *et seq.*, [hereinafter 2012 Draft RP].) That team, comprised of leading wolf scientists, drafted a Mexican Wolf Revised Recovery Plan in full. (*See id.*) However, FWS thereafter halted the recovery planning process, and the draft was never published. (*See* AGFD Letter to FWS (Sept. 23, 2014), AR C085274 at C085281–82; Email from Tracy Melbihess (Oct. 23, 2013), AR N077606 at N077606.)

*2015 10(j) Rule*

Litigation in 2010 prompted revision to the 1998 10(j) rule. In settlement of *Center for Biological Diversity v. Jewell,* No. 1:12-CV-1920 (D.D.C. 2013), FWS agreed

---

[6] For example, FWS's 2005 Five-Year Review observed that recommendations from the agency's Three-Year Review had not been implemented. (5-Yr Review at N000559–60.)

[7] Over 10,000 comments were received in conjunction with the Five-Year Review and the review team found that a significant portion of the population had "strongly held attitudes toward wolves in the BRWRA," both in support of and in opposition to wolf reintroduction. (5-Yr Review N000559–60, N000856.) The team noted the vehemence with which these groups held their position on the wolf and the anger they held for the opposition. (*Id.*)

to publish a 10(j) rule modification by January 16, 2015. (Doc. 22 in case No. 1:12-CV-1920; s*ee* Email from Jonathan Olson (Dec. 16, 2013), AR N006047, *et seq.*) In 2013, in anticipation of this deadline, FWS commenced the public scoping process required by federal law. As part of this process, the agency solicited peer review opinions from six scientists with expertise that included familiarity with wolves, the geographic region in which wolves occur, and conservation biology principles. (2015 10(j) Rule at FR000137, FR000150.) FWS invited 84 federal and state agencies, local governments, and tribes to participate as cooperating agencies in the development of the environmental impact statement, 27 of which participated. (*Id.* at FR000158.) FWS maintained a list of individual stakeholders and a Web site to ensure that interested and potentially affected parties received information on the EIS. (*Id.*) In November 2014, following additional opportunity for public comment, FWS published the Final Environmental Impact Statement (FEIS), which analyzed four alternatives for improving the effectiveness of the reintroduction program. (*See* FEIS at N042619–21, N042688.) On January 6, 2015, FWS issued a Record of Decision, selecting Alternative One as the preferred alternative. (Record of Decision, AR N034602, *et seq.*) Alternative One contained the following key provisions.

### 1. Population Cap and Effective Migration Rate

The rule sets a population objective of a single population of 300–325 Mexican wolves within the MWEPA, with a minimum one to two effective migrants per generation entering the population, depending on its size, over the long term. (2015 10(j) Rule at FR000141.) Although FWS does not expect to reach the 300–325-wolf objective until after year 13 (2014 FEIS at N043054), FWS nevertheless concluded the population objective "would provide for the persistence of [the] population and enable it to contribute to the next phase of working toward full recovery of the Mexican wolf and its removal from the endangered species list." (2015 10(j) Rule at FR000138–39A). Additionally, "[i]n the more immediate future, FWS may conduct additional releases in excess of 1–2 effective migrants per generation to address the high degree of relatedness

of wolves in the current BRWRA." (*Id.* at FR000141.) Finally, so as not to exceed the population objective, FWS will exercise "all management options," with a preference for translocation. (*Id.* at FR000173.) In support of the population objective, FWS relied upon two scientific studies: Carroll, et al. (2014) and Wayne and Hedrick (2010).

### 2. Expanded MWEPA

The rule also expands the MWEPA to encompass all of Arizona and New Mexico south of Interstate 40 ("I-40"), totaling 153,871 square miles. (*Id.* at FR000143.) The term "BRWRA" was discontinued, and the MWEPA was divided geographically into three zones, each designated for the release, translocation, or dispersal of wolves. (*Id.* at FR000144, FR000147.) In Zone 1, Mexican wolves may be initially released or translocated. In Zone 2, Mexican wolves will be allowed to naturally disperse and occupy, and wolves may be translocated within the zone. Pups under five months of age will be released on federal land in Zone 2. In Zone 3, neither initial releases nor translocations will occur, but Mexican wolves will be allowed to disperse into and occupy this zone. Zone 3 is an area of less suitable Mexican wolf habitat where Mexican wolves will be more actively managed to reduce conflict with the public. (*Id.* at FR000143–48.) Unlike the BRWRA, which included principally national forest land, the expanded MWEPA includes a significant amount of non-federal land. (*Id.* at FR000149.) The rule does not authorize the use of suitable wolf habitat north of I-40. FWS explained that expansion north of I-40 would require coordination with Utah and Colorado and must be implemented through a revised recovery plan. (*Id.* at FR000162, FR000164.)

### 3. Expanded Take Provisions

The 2015 rule modifies the circumstances in which lethal and nonlethal take are authorized, with the aim to provide greater management flexibility and "make reintroduction compatible with current and planned human activities, such as livestock grazing and hunting." (*Id.* at FR000148–49.)

Most notably, the rule authorizes lethal and non-lethal take in response to unacceptable impacts to wild ungulate herds. If an Arizona or New Mexico game and fish

agency determines that Mexican wolf predation is having an unacceptable impact to a wild ungulate herd, the respective agency may request approval from FWS that the wolves be removed from the impacted area. (*Id.*) Along with its request, the state agency must submit a science-based document that has been subjected to peer-review and public comment, describing what data indicate that the wild ungulate herd is below management objectives and demonstrating that attempts were made to identify other causes of herd declines. (Permit at P000668–69.) An "unacceptable impact" is determined by the state game and fish agency, based upon ungulate management goals, or a 15 percent decline in an ungulate herd as documented by the state agency using its preferred methodology. (2015 10(j) Rule at FR000173.) If all of the requirements are met, FWS will "to the maximum extent allowable under the Act, make a written determination of what management action is most appropriate for the conservation of the subspecies." (*Id.* at FR000168; 50 C.F.R. § 17.84(k)(7)(C).) In the FEIS, FWS reported that, since reintroduction commenced, state-collected data demonstrates that there has been "no discernable impact" from Mexican wolf predation on elk in the BRWRA. (2014 FEIS at N043840.) FWS further projected that wolves would have "little or no effect on the abundance of elk and deer across most of Arizona and New Mexico where elk and deer abundance is stable, or above population objectives." (*Id.* at N042840.)

### 4. Nonessential Designation

Finally, the 2015 rule maintains the experimental population's "nonessential" status, which was first designated in the 1998 rulemaking. In support of this decision, FWS noted the Mexican wolf population that is in the wild in Arizona and New Mexico today is the same population that was designated in the 1998 final rule. (2015 10(j) Rule at FR000163.) FWS reasoned that because the purpose of the 2015 rule is to revise management protocols for an existing population, reconsideration of the population's nonessential status was "outside the scope" of the rulemaking. (*Id.*)

*Scientists' Response to FWS's Selection of Alternative One*

Prior to FWS's publication of the 2015 10(j) rule, a group of scientists informed FWS, through submission of a formal public comment, that FWS misstated and misinterpreted the scientists' findings. (Comment from Carroll, *et al.*, (December 19, 2014), AR N057614 at N057615 (hereinafter Carroll Comment).) Among the scientists who joined in the comment were Drs. Carroll, Wayne, and Hedrick, whose publications were cited by FWS in support of the FEIS and the 2015 10(j) rule.[8] (*See* 2014 FEIS at N042672; 2015 10(j) rule at FR000141.) The scientists asserted FWS misrepresented their conclusions with respect to: (1) the relationship between population size and extinction risk for the experimental population, and (2) the relationship between effective migration rate and the long-term genetic health of the population. (Carroll Comment at N057616–18.) These concerns were largely premised on the fact that the cited publications analyzed effects on a population present within a metapopulation (*i.e.*, three populations connected by dispersal), whereas the FEIS assumed the same outcomes for a single isolated population. (*See id.*) In light of this discrepancy, the scientists opined that FWS's population objective and effective migration rate failed to prevent long-term erosion in the genetic health of the experimental population of Mexican wolves and that the selected course of action would therefore hinder the recovery of the species. As stated in the comment from the scientists:

> [G]iven the current depauperate genetic composition and the high relatedness of the Blue Range population, in order for this population to contribute to recovery it is necessary to not only forestall further genetic degradation but also reduce the high relatedness of the Blue Range population and increase its levels of genetic variation. The success of this effort depends on it being initiated while the population is still small, when each newly released individual has a greater genetic effect on the recipient

---

[8] The scientists who authored the comment were Drs. Carlos Carroll, Richard J. Fredrickson, Robert C. Lacy, Robert K. Wayne, and Philip W. Hedrick. (*See* Carroll Comment at N057619.) Some or all of these scientists have been cited in the major agency publications on Mexican wolf recovery since 1998, including the Three- and Five-Year Reviews of the reintroduction program, the 2010 Conservation Assessment, the 2012 Draft Recovery Plan, the 2014 DEIS and FEIS for the 2015 10(j) rule, the 2015 listing rule, and the 2015 10(j) rule.

population. Releases from the captive population at a rate equivalent to 2 effective migrants per generation would therefore be inadequate to address current genetic threats to the Blue Range population.

(*Id.* at N057618.) The scientists concluded that their "fundamental concern" was that the EIS gave "an overly optimistic depiction of the long term viability of the Blue Range population." (*Id.*)

In spite of the scientists' concern for the impacts on wolf recovery, on January 16, 2015, FWS published the 10(j) rule with the key provisions of Alternative One described above.[9] (2015 10(j) Rule at FR000136, *et seq.*) The present lawsuit, challenging the 2015 rule, was filed that same day.

### *FWS's Stated Purpose of Rule*

Like the 1998 10(j) rule before it, the 2015 10(j) rule was not intended to provide full recovery of the species, but to help the agency achieve the "'first step toward recovery,' as envisaged by the 1982 Recovery Plan." (*See* 2014 FEIS at N042669, N042672, N042692.) As defined by FWS, the purpose of the rule is "to improve the *effectiveness* of the reintroduction project to achieve the necessary population growth, distribution, and recruitment, as well as genetic variation within the Mexican wolf experimental population *so that it can contribute to recovery in the future*." (2015 Rule at FR000148 (emphasis added).) FWS found that by improving the effectiveness of the project, the "potential for recovery of the species" would increase. (*Id.* at FR000136; *see also* FR000148.) With this purpose in mind, FWS notes that specific measures not yet implemented by the agency will likely be necessary to recover the species, including objective and measurable criteria for delisting, a scientifically based population goal, and expanded dispersal area based upon the establishment of a metapopulation. (*Id.* at FR000141, FR000148, FR000150, FR000164; 2014 FEIS at N042692.) FWS will review the progress of reintroduction under the new rule in year five, with a focus on

---

[9] The rule is published in the Federal Register at 80 Fed. Reg. 2512 and codified at 50 C.F.R. § 17.84(k). Concurrently with the Section 10(j) rule, FWS issued a final rule changing the designation of the Mexican wolf from endangered species to endangered subspecies. 80 Fed. Reg. 2488 (Jan. 16, 2015).

1     modifications needed to improve the efficacy and the contribution the population is

2     making toward recovery of the Mexican wolf. (2015 10(j) Rule at FR000150.)

3     *Current Status of the Species*

4     In the 2014 FEIS, FWS acknowledged that the experimental population was not

5     thriving. (2014 FEIS at N042674; *see also* 2010 CA at N052341.) As described by FWS,

6     "the experimental population is considered small, genetically impoverished, and

7     significantly below estimates of viability appearing in the scientific literature." (FEIS at

8     N042674.) In the 2015 10(j) rule, FWS acknowledged that the goal of a viable, self-

9     sustaining population of 100 wolves has never been met. (*See* 2015 10(j) Rule at

10    FR000175.) Although in 2014 the number of wolves in the experimental population

11    jumped to 110, it dropped again in 2015 to 97. (Doc. 135, pp. 3–4.) FWS estimated that

12    between 1998 and 2013, the "initial release success rate" was about 21 percent, which

13    meant that for every 100 wolves released, only 21 of them survived, bred, and produced

14    pups, therefore becoming "effective migrants." (2015 10(j) Rule at FR000148.) It is

15    undisputed that the growth of the experimental population has been hindered by

16    escalating adult mortalities, illegal takings, and pup mortality.  Lawful wolf removals by

17    the agency have also hindered population growth: from 1998 to 2002, 110 wolves were

18    released and 58 were removed; from 2003 to 2007, 68 wolves were released and 84 were

19    removed; from 2008 and 2013, 19 wolves were released and 17 were removed. (*Id.* at

20    FR000140; 2014 FEIS at N042666–67, N042670.) The agency has recognized that

21    permanent removals have the same practical effect on the wolf population as mortality.

22    (2010 CA at N052324.) Moreover, past removals and lethal control measures have led to

23    the loss of genetically valuable animals. (*See* Comment by David Parsons (Dec. 2007),

24    AR N043398, at N043404 (discussing the agency's killing of AM574, the sixth most

25    genetically valuable wolf, and the removal of wolves from the Aspen pack).) As one

26    employee of FWS stated: "Our management/recovery actions are propping up the

27    subspecies but without that it would tank (extinct within immediate future)." (J006456,

28    Internal FWS edits to Draft Mexican Wolf Listing Rule (Sept. 23, 2012)).

FWS has repeatedly recognized that one of the chief threats to the species is loss of genetic diversity. Genetically depressed wolves have lower reproductive success, including smaller litter sizes, low birth weights, and higher rates of pup mortality, as well as lowered disease resistance and other accumulated health problems. (2015 Listing Rule at J016142.) FWS estimates that the captive population retains only three founder genome equivalents—*i.e.*, more than half of the genetic diversity of the seven original founders has been lost from the population. (Mexican Wolf Listing Rule, AR J016124, at J016143 (Jan. 16, 2015) (hereinafter 2015 Listing Rule).) By 2014, the captive population had reached approximately 258 wolves, but 33 of those wolves were reproductively compromised or had very high inbreeding coefficients. The age structure of the captive population was also heavily skewed, such that sixty-two percent of the population was composed of wolves that would die within a few years. This, combined with the release of captive wolves into the wild, means that the overall genetic diversity of the captive population will decline in coming years. (*Id.*)

The state of the captive population, in turn, affects the level of genetic fitness achieved by the experimental population. (2015 Listing Rule at J016143 ("The gene diversity of the experimental population can only be as good as the diversity of the captive population from which it is established.")). In 2014, the experimental population had 33 percent less genetic representation than the captive population. (2014 FEIS at N042673.) Members of the reintroduced population were, on average, as related to each other as full siblings. (*Id.*) As described by Dr. Fredrickson, "the reintroduced population is a genetic basket case in need of serious genetic rehab. Failing to do so is irresponsible and also managing for extinction." (Email to FWS (Nov. 24, 2013), AR J017818.)

### *Future Recovery Requirements*

In its 2014 FEIS, FWS discussed the relationship between population size, distribution, and genetic fitness, and the impacts these factors have on species viability. (*See* 2014 FEIS at N042669–75.) According to the agency, "[a] species with a small population, narrowly distributed, is less likely to persist (in other words it has a higher

risk of extinction) than a species that is widely and abundantly distributed." (*Id.* at N042671.) The combination of a small number of animals with low genetic variation is particularly harmful, as it can lead to an "extinction vortex," a self-amplifying cycle which results in decreased fitness and lower survival rates. (*Id.*) According to FWS, "[t]he Mexican wolf, in particular, is more susceptible to population decline than other gray wolf populations because of smaller litter sizes, less genetic variation, lack of immigration from other populations, and potential low pup recruitment." (*Id.* (citations omitted).)

Scientists have concluded that establishing a metapopulation is necessary to achieve the recovery of the species. In their 2014 publication, Drs. Carroll, Fredrickson and Lacy found that the "viability of the existing wild population is uncertain unless additional population can be created and linked by dispersal of >0.5 migrants/generation." (Carroll, *et al.*, Developing Metapopulation Connectivity Criteria from Genetic and Habitat Data to Recover the Endangered Mexican Wolf (2014), AR N004225, at N004233.) Likewise, in its 2012 draft recovery plan, the Mexican wolf recovery team determined that establishment of a metapopulation was one of five criteria necessary to accomplish the delisting of the subspecies. (2012 Draft RP at C043106–07.) Although FWS stated in the 2014 FEIS it lacks "sound, peer-reviewed, scientific basis" to determine what is needed for full recovery (2014 FEIS at N042692), FWS has also recognized that the future success of the Mexican wolf "is likely to depend on the establishment of a metapopulation or several semi-disjunct populations spanning a significant portion of its historic range in the region." (2015 10(j) Rule at FR000175.) FWS asserts that this must be accomplished through the development of a revised recovery plan, which may, in turn, require further revision to the experimental population regulations and any necessary analysis pursuant to NEPA. (2015 10(j) Rule at FR000141, FR000148.)

### *November 2017 Draft Revised Recovery Plan & Related Litigation*

On November 30, 2017, in response to litigation by environmental groups and the

State of Arizona, FWS completed a revised recovery plan for the Mexican gray wolf.[10] FWS received 101,010 public comments on the draft plan. (Doc. 57, p. 2 in case No. CV-14-02472-TUC-JGZ.) The 2017 draft recovery plan, which provides criteria for the delisting of the species, anticipates two inter-connected populations of Mexican wolves in the United States and Mexico. (2017 RP at 10, 18–20.) In the United States, implementation of the new plan will involve a single population in Arizona and New Mexico, south of I-40. (*Id.* at 11.) FWS anticipates that under the new plan the Mexican wolf will be recovered in 25-35 years. (*Id.* at ES-3.) The Center for Biological Diversity *et al.* filed a separate action challenging the 2017 revised recovery plan on January 30, 2018, alleging that the plan fails to provide for the recovery of the Mexican wolf. (*See* doc. 1, in case No. CV-18-00047-TUC-JGZ.)

## DISCUSSION

For the reasons discussed below, the Court finds that the 2015 10(j) rule fails to further the conservation of the Mexican wolf. The Court further finds that the essentiality determination is arbitrary and capricious. Because these two requirements of Section 10(j) have not been met, the Court will remand to the agency for further proceedings consistent with this Order.

**I.    The 2015 Section 10(j) rule fails to further the recovery of the Mexican wolf.**

Before authorizing the release of an experimental population under ESA Section 10(j), the Secretary must, by regulation, determine that such release will "further the conservation of [the] species." 16 U.S.C. § 1539(j)(2)(A); *see also* 50 C.F.R. § 17.81(b). Plaintiffs CBD, WEG, the Coalition, and SCI each ask the Court to invalidate all or part of the 2015 10(j) rule on the ground that the rule fails to further the recovery of the

---

[10] *See* doc. 55 in case No. CV-14-02472-TUC-JGZ; doc. 49 in case No. CV-15-00245-TUC-JGZ. The Court takes judicial notice of the first revision to the 2017 Mexican Wolf Recovery Plan, which is a publicly available document. *See* https://www.fws.gov/southwest/es/mexicanwolf/pdf/2017MexicanWolfRecoveryPlanRevision1Final.pdf (last visited March 27, 2018); 82 Fed. Reg. 29,918. The information from the 2017 plan is discussed herein as background only.

species.[11,12] Alternatively, Federal Defendants and Defendant-Intervenor Arizona (collectively "Defendants" for the purposes of this section) ask this Court to uphold the 2015 10(j) rule on the ground that it complies with the ESA's requirement to further the recovery of the species. Having considered the parties' arguments, the Court concludes that the 2015 rule only provides for the survival of the species in the short term and therefore does not further recovery for the purposes of Section 10(j). The Court also agrees with CBD and WEG that, by failing to provide for the population's genetic health, FWS has actively imperiled the long-term viability of the species in the wild.

A. The 2015 10(j) rule provides only for short-term survival of the species and fails to further the long-term recovery of the Mexican wolf in the wild.

FWS implemented the 2015 10(j) rule as an interim measure that would improve the effectiveness of the reintroduction program, until such time as further recovery actions may be accomplished. Although the rule contemplates an increase in certain metrics, such as population size and geographic range, it does not, in and of itself, further the recovery of the species. Rather, the rule only ensures the short-term survival of the

---

[11] The question of whether the 2015 10(j) rule furthers recovery of the species is raised in each of the four cases, and the Court's resolution of this issue thus affects each of the 12 pending motions for summary judgment. Although CBD, WEG, the Coalition, and SCI each argue that the rule fails to further recovery of the species, their arguments as to *why* often vary so greatly that the Court may agree with the proposition set forth by a party, but nevertheless reject that party's reasoning. In an effort to fully address the parties' claims and to give guidance to the agency on remand, the Court addresses all of the arguments related to furthering recovery together in this section. In sum, the Court finds the reasoning of CBD and WEG persuasive on this issue, and rejects the reasoning of the Coalition and SCI.

[12] In a related argument, SCI contends that the Secretary violated Section 4(d) of the ESA, 16 U.S.C. § 1533(d), by (1) failing to issue experimental population regulations necessary and advisable for the conservation of the species, and (2) failing to include SCI's requested escape clause. (Doc. 69 in case No. CV-16-00094-TUC-JGZ, pp. 31–33, 35–38.) The Ninth Circuit has rejected the argument that a Section 10(j) regulation must meet the requirements of ESA Section 4(d). *United States v. McKittrick*, 142 F.3d 1170, 1176 (9th Cir. 1998). Accordingly, the Court will deny summary judgment on SCI's claims raised under ESA Section 4(d).

species.

The rule's provision for a single, isolated population of 300-325 wolves, with one to two effective migrants per generation, does not further the conservation of the species and is arbitrary and capricious. When FWS approved the population size and effective migration rate, it misinterpreted the findings of Carroll et al. (2014) and Wayne & Hedrick (2010), which it had relied upon to support its population objective. Specifically, the population size and effective migration rate that was selected for the final rule fails to account for the fact that the Blue Range population is not connected to a metapopulation and suffers from a higher degree of interrelatedness than is assumed in those studies. When these circumstances are factored in, Drs. Carroll, Wayne and Hedrick, among others, conclude that the effective migration rate and population size in the 2015 rule are insufficient to ensure the long-term viability of the species. In their public comment to FWS, Drs. Carroll et al. state that "[r]eleases from the captive population at a rate equivalent to 2 effective migrants per generation would . . . be inadequate to address current genetic threats to the Blue Range population." They further note that forestalling genetic degradation and reducing the high relatedness of the population are actions that must be taken early on, while the population is still small, "*in order for this population to contribute to recovery*." (Carroll Comment at N057618.) To the extent that FWS now seeks to argue in this litigation that the population size and effective migration rate further the recovery of the species, the Court finds that that position is not entitled to deference. *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 969 (9th Cir. 2002) ("While we give deference to an administrative agency's judgment on matters within its expertise, here the Forest Service's own scientists have concluded that the 'Forest Plan approach to sustaining old growth through the planning period is invalid'. . . .").

Indeed, FWS itself acknowledges in the 2015 rule that "a small isolated Mexican wolf population, such as the existing experimental population, can neither be considered viable nor self-sustaining." (2015 10(j) Rule at FR000138–39A). FWS nevertheless justified the population objective on the grounds that it "would provide for the

persistence of the population and enable it to contribute to the next phase of working toward full recovery of the Mexican wolf . . . ." (*Id.*) "Persistence" is antithetical to the ESA's recovery mandate. *Gifford Pinchot Task Force v. United States Fish and Wildlife Serv.*, 378 F.3d 1059, 1070, ("[T]he ESA was enacted not merely to forestall the extinction of species (i.e., promote a species survival), *amended*, 387 F.3d 968 (9th Cir. 2004), but to allow a species to recover to the point where it may be delisted."); *Sierra Club v. United States Fish & Wildlife Serv.*, 245 F.3d 434, 438 (5th Cir. 2001) ("[T]he objective of the ESA is to enable listed species not merely to survive, but to recover from their endangered or threatened status."). Ensuring the short-term survival of the species falls short of Section 10(j)'s requirement that the release of an experimental population further the recovery of the species. 16 U.S.C. § 1539(j)(2)(A). In sum, in approving the population size and effective migration rate, FWS first failed to articulate a rational connection between the facts in the record and the choice made, *Forest Guardians*, 329 F.3d at 1099, and second justified its deficiency on the "short-term" nature of the rule, which is legally insufficient under the ESA. *See Judulang*, 565 U.S. at 53, 55 (agency decision must be based on relevant factors that are tied to the purpose of the underlying statute).[13] Accordingly, the Court concludes that the population size and effective migration rate, which do not further the conservation of the species, are arbitrary and

---

[13] The remaining provisions of the 2015 rule fail to remedy this deficiency and, in some instances, threaten to compound the problem. In spite of the fact that the rule does not provide a minimum population size and effective migration rate to protect against genetic deterioration, FWS imposed a population cap that creates the potential for removal or killing of genetically valuable wolves. The rule permits the agency to use "all available management options" so as not to exceed the cap. Although the rule expresses the agency's "preference for translocation," it permits the agency to use "all available management options" so as not to exceed the cap. (*See* Comment by David Parsons (Dec. 2007), AR N043398, at N043404 (discussing the agency's killing of AM574, the sixth most genetically valuable wolf, and the removal of wolves from the Aspen pack). Similarly, although FWS acknowledges that territory north of I-40 will likely be required for future recovery and recognized the importance of natural dispersal and expanding the species' range, it nevertheless imposed a hard limit on dispersal north of I-40. Any wolves that venture outside the MWEPA will be captured and returned. The agency again relied on the limited scope of the rule to justify this provision, stating that the purpose of the rule is to improve the effectiveness of the reintroduction project and citing to the recovery plan as the likely means of addressing the insufficient geographic range that is provided by the present rule.

capricious.

In addition, the expanded take provisions contained in the new rule do not contain adequate protection for the loss of genetically valuable wolves. The agency's authority to manage a 10(j) population includes the option to authorize lethal and nonlethal take. This authority stems not from biological considerations, but from the agency's need to coordinate the recovery effort with affected stakeholders. However, in issuing take permits, "the Secretary is subject to the requirement of Section 10(d) that issuance will not operate to the disadvantage of the listed species," S. Rep. No. 97-418 at 8, and the permit issued must be consistent with the ESA's conservation purpose and policy, 16 U.S.C. § 1539(d). FWS has repeatedly recognized that one of the chief threats to the species is loss of genetic diversity, *see* discussion, *supra* p. 21, yet the expanded take provisions lack protections for loss of genetic diversity. Instead, FWS justifies the expanded take provisions on the ground that they will "make reintroduction compatible with current and planned human activities, such as livestock grazing and hunting." This explanation fails to show that FWS considered the requirements of Section 10(d), or that its decision adhered to the ESA's conservation purpose.

Defendants concede that the 2015 rule is not sufficient in the long term, and offer a series of justifications for the rule's short-term focus, each of which the Court rejects. First, Defendants urge the Court to find that the rule is sufficient in light of the recovery plan, which, at the time of briefing, was forthcoming, but has since been issued and subject to legal challenge. The Court concludes that the substance or terms of future recovery actions, do not relieve FWS of its obligations under Section 10(j). Moreover, the provisions of a recovery plan are discretionary, not mandatory. Thus, even if the recovery plan contained all terms promised by Defendants here, there is no guarantee that those terms will protect against the harms that the Court finds presented by 10(j) rule.[14]

---

[14] The Court rejects the Coalition's argument that the 2015 10(j) rule fails to further recovery because it does not conform to the terms of the existing recovery plan or that the rule is necessarily deficient because it was finalized in advance of the forthcoming revised recovery plan. (Doc. 109, pp. 14–17, 22–23.) Recovery plans do not

Defendants next contend that the rule is sufficient as an interim measure, under the agency's stepwise approach to recovery, and that any deficiencies in the rule will not result in harm the Mexican wolf in the foreseeable future. This argument completely misconstrues the principles guiding recovery, which focus on long-term viability of the species, and again requires that the Court rely on the promise of future action that may never be implemented. The Court declines to do so. The experimental population that is the subject of this litigation is the only population of Mexican wolves in the wild. *See Motor Vehicle Mfrs. Ass'n of United States, Inc.*, 463 U.S. at 43. It is undisputed that recovery of the population is in genetic decline and that the present agency action will have long-term effects on the genetic health of the species.

Nor does the significant "management flexibility" afforded to the agency under Section 10(j) justify the failure to further the long-term recovery of the Mexican gray wolf. Section 10(j) was added to the ESA by amendment in 1982 as a means of providing FWS with administrative and management flexibility to transplant an endangered species into previously uninhabited habitat. *See* 49 Fed. Reg. 33,885, 33,886, 33,889 (Aug. 27, 1984). Indeed, as the Ninth Circuit has noted, "Congress's specific purpose in enacting section 10(j) was to 'give greater flexibility to the Secretary.'" *United States v. McKittrick*, 142 F.3d 1170, 1174 (9th Cir. 1998) (quoting H.R. Rep. No. 97-567, at 33 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2807, 2833.). However, there is no indication

---

govern all aspects of recovery under the ESA, but rather are non-binding statements of intention with regards to the agency's long-term goal of conservation. *See Friends of Blackwater v. Salazar*, 691 F.3d 428, 434 (D.C. Cir. 2012) (a recovery plan is a non-binding, "statement of intention," and not a contract); *Conservation Cong. v. Finley*, 774 F.3d 611, 620 (9th Cir. 2014) (declining to adopt particular recommendations in a recovery plan, which is nonbinding on an agency, does not constitute failing to consider them). The agency may move forward with conservation goals under other sections of the ESA, even in the absence of an updated recovery plan. *Arizona Cattle Growers' Ass'n v. Kempthorne*, 534 F. Supp. 2d 1013, 1025 (D. Ariz. 2008), *aff'd sub nom. Arizona Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160 (9th Cir. 2010) (rejecting the argument that the agency cannot move forward with a conservation effort without first identifying in a recovery plan the precise point at which conservation will be achieved).

that the management flexibility afforded to the agency under Section 10(j) was intended to displace the ESA's broader conservation purpose, or that it overrides the duty to use the best available science. On the contrary, it is clear from the legislative history that the management flexibility afforded under Section 10(j) "*allows the Secretary to better conserve and recover endangered species.*" *McKittrick*, 142 F.3d at 1174 (emphasis added). The Court is not unsympathetic to the challenges the agency faces in its efforts to recover such a socially controversial species. As FWS observed in 1982, any recovery effort must deal with the residue of a long history of anti-wolf sentiment by the public. (1982 RP at R000895.) However, any effort to make the recovery effort more effective must be accomplished without undermining the scientific integrity of the agency's findings and without subverting the statutory mandate to further recovery. The agency failed to do so here.

In reaching its conclusions, the Court is mindful that when reviewing scientific findings within the agency's area of expertise, it is at its most deferential. *The Lands Council*, 559 F.3d at 1052; *accord Baltimore Gas and Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983). However, this is not a case in which the agency was required to choose between conflicting scientific evidence. On the contrary, the best available science consistently shows that recovery requires consideration of long-term impacts, particularly the subspecies' genetic health. Moreover, this case is unique in that the same scientists that are cited by the agency publicly communicated their concern that the agency misapplied and misinterpreted findings in such a manner that the recovery of the species is compromised.[15] To ignore this dire warning was an egregious oversight by the agency. *Idaho Sporting Cong., Inc.*, 305 F.3d at 969 (declining to defer to the

---

[15] The Court rejects the Coalition's argument that FWS did not have the scientific data necessary to make an informed decision about recovery. (*See* doc. 153, p. 12.) The Coalition's principal challenge is that Dr. Carroll's 2014 study utilized data collected from North American gray wolves, rather than Mexican gray wolves. The Coalition fails to explain why this renders the data invalid or present better existing data. *See* 50 C.F.R. § 17.81(b) (Secretary shall utilize the "best scientific and commercial data *available*" in considering effects on recovery) (emphasis added).

agency's judgment on matters within agency expertise where the Forest Service's own scientists concluded a forest plan standard was invalid).

In sum, FWS failed to consider recovery, in accordance with 50 C.F.R. § 17.81(b), or to further the conservation of the species under Section 10(j), 16 U.S.C. § 1539(j)(2)(A). The rule as a whole fails to further recovery: FWS did not create a population in the 2015 rule that would be protected against the loss of genetic diversity, and there are no other viable populations to cushion the subspecies from the long-term harm that is predicted to result under the 2015 rule. Accordingly, the Court concludes that the 2015 10(j) rule is arbitrary and capricious, and will grant summary judgment in favor of CBD and WEG on this ground in cases Nos. CV-15-00019-TUC-JGZ and No. CV-15-00285-TUC-JGZ.

B.     The revised rule does not need to be the product of an agreement with state and private stakeholders.

The Court rejects SCI's argument that the 2015 10(j) rule is invalid because it was adamantly opposed by state and private stakeholders. (*See* doc. 69 in case No. CV-16-00094-TUC-JGZ, pp. 18–31, 33 – 35.) Section 10(j) of the ESA does not require that the 10(j) rule be the product of an agreement with state and private stakeholders. S*ee* 16 U.S.C. § 1539(j). The Court disagrees with SCI's assertion that Congress intended such a requirement and concludes SCI has failed to demonstrate any "clearly contrary congressional intent" in the legislative history to the 1982 ESA amendments. *See Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 884 (9th Cir. 2001) (where statute's plain meaning is clear, a review of the legislative history is strictly limited to ensure no clearly contrary congressional intent). On the contrary, the legislative history demonstrates that, although Congress anticipated Section 10(j) regulations would be implemented in consultation with affected parties, the Secretary would retain the authority and management flexibility to issue regulations that further the conservation of the species. *See* H.R. Rep. 97-567, 97th Cong., 2d Sess. § 5 (May 17, 1982); *see also Wyo. Farm Bureau Fed'n v. Babbitt*, 987 F. Supp. 1349, 1366 (D. Wyo. 1997), *rev'd on*

*other grounds*, 199 F.3d 1224 (10th Cir. 2000).

The Court similarly rejects SCI's argument that FWS violated 50 C.F.R. § 17.81(d)'s requirement that regulations represent, "to the maximum extent practicable," a cooperative agreement between state and federal agencies and private landowners. Although FWS revised the 1998 10(j) rule to increase the number of wolves permitted in the MWEPA against the wishes of New Mexico's hunting community and New Mexico state wildlife management authorities (doc. 69 in case No. CV-16-00094-TUC-JGZ, pp. 29–30), the Court cannot conclude that FWS violated 50 C.F.R. § 17.81(d) when it declined to adopt the position of certain stakeholders. The record in this case reveals that prior to finalizing the FEIS and Section 10(j) rule, FWS consulted and coordinated with many parties, including New Mexico wildlife management agencies and private stakeholders. FWS held formal and informal meetings with New Mexico's wildlife management authorities, maintained stakeholder mailing lists, and worked with state agencies to collect and analyze data on biological and economic factors. (*See* FEIS at N042931–41; 2015 10(j) Rule at FR000176.) FWS also invited 84 state, tribal, and federal government entities to participate as cooperating parties pursuant to memoranda of understanding. (*See* 2015 10(j) Rule at FR000158.) SCI's contention that these efforts do not constitute an agreement "to the maximum extent practicable" is unpersuasive. The Court cannot find that FWS abdicated its duty when it declined to adopt a position of a select few parties that would be tantamount to a veto on the agency action, as this would effectively prevent the agency from carrying out its statutory mandate in the absence of complete consent. Accordingly, the Court will deny summary judgment to SCI on this ground.

C.     The rule provides sufficient suitable habitat for the species.

The Court rejects the Coalition's argument that in the 2015 10(j) rule, FWS failed to provide sufficient suitable habitat for the Mexican wolf. Under agency regulations, an experimental population shall be "*released* into suitable natural habitat…." 50 C.F.R. § 17.81(a) (emphasis added). FWS asserts in its 2014 FEIS it "will not release or

translocate Mexican wolves into areas that do not have suitable habitat." (2014 FEIS at N043074.) In its 2015 rulemaking the agency repeatedly notes that it expects wolves to occupy areas of suitable habitat, and that portions of the MWEPA considered unsuitable for permanent occupancy are necessary to permit wolves to roam and travel to new territories.[16] (2014 FEIS at N042677–78.) Neither the ESA, nor 50 C.F.R § 17.81(a), requires FWS to limit the total geographic range of an experimental population to suitable habitat. Moreover, the Coalition has not provided any authority that would restrict the agency's use of unsuitable habitat for purposes other than release. Accordingly, the Court will deny the Coalition's motion for summary judgment on these grounds.[17]

## II. FWS's essentiality determination was arbitrary and capricious.

In 1998, when FWS first designated the experimental population of Mexican wolves, the agency determined in accordance with ESA Section 10(j)(2)(B) that the population was not essential to the continued existence of the species. In 2015, the population's "nonessential" designation was carried over to the revised rulemaking: FWS declared that nothing in the 2015 rule changed the designation and the agency was not "revisiting" the 1998 determination. (2015 10(j) Rule at FR000174.) FWS explained that because the purpose of the 2015 rule was to revise management protocols for an existing population, reconsideration of the population's nonessential status was "outside the scope" of the rulemaking. (*Id.* at FR000163.)

In its present Motion for Summary Judgment, WEG argues that FWS's decision to

---

[16] Moreover, restricting the agency's use of unsuitable habitat would go against Congress's intent to further the conservation of threatened and endangered species and to minimize potential conflicts with local landowners. *See Wyoming Farm Bureau Federation v. Babbitt*, 199 F.3d 1224, 1231 (10th Cir. 2000) ("Congress added section 10(j) to the Endangered Species Act in 1982 to address the Fish and Wildlife Service's and other affected agencies' frustration over political opposition to reintroduction efforts perceived to conflict with human activity.").

[17] The Coalition's argument that the agency failed to meet its "stated requirements for suitable habitat as an area with 'limited or no livestock grazing' and 'minimal human use'" is similarly unpersuasive. Although livestock grazing and human use are discussed in the 2014 FEIS in the context of "suitable habitat," FWS does not explicitly state that the criteria for suitable habitat are limited to these factors.

maintain the experimental population's nonessential status was arbitrary and capricious.[18] (Doc. 112, pp. 12–26.) WEG contends that the change in listing status of the Mexican wolf, from endangered species to endangered subspecies, triggered a duty to perform a new essentiality determination, and that the agency's reliance on the outdated 1998 determination failed to use the best available science. (*Id.*) Federal Defendants and Defendant-Intervenor Arizona (collectively "Defendants," for the purposes of this section) argue that there is no obligation under the ESA or agency regulations to perform a new essentiality determination when the agency voluntarily revises an existing 10(j) rule, as FWS did in 2015. (Doc. 134, pp. 19–25; doc. 142, pp. 9–12.) According to Defendants, the experimental population of Mexican wolves was released in 1998, and the essentiality determination performed at that time is in full satisfaction of the Secretary's duty under Section 10(j). (*Id.*)

The Court concludes that because the effect of the 2015 rulemaking was to authorize the release of an experimental population outside its current range, a new essentiality determination was required and the agency's decision to maintain the population's nonessential status without consideration of the best available information was arbitrary and capricious.

A.    FWS is required to perform a new essentiality determination when it authorizes the release of an experimental population outside the species' current range.

Section 10(j)(2) of the ESA requires the Secretary to perform an essentiality determination prior to authorizing the release of any population of an endangered species *outside the current range of such species*. *See* 16 U.S.C. § 1539(j)(2)(A), (B). In 1998, there was no existing range for the Mexican wolf; the subspecies had been completely extirpated from the wild. At that time, FWS authorized a release of wolves into the BRWRA, a 6,854 square-mile area. The 2015 rule provides for the release of Mexican

_____

[18] Plaintiff WEG is the only party to challenge the 2015 essentiality determination, and accordingly the resolution of the present issue affects only the motion and cross-motions for summary judgment filed in case No. CV-15-00285-TUC-JGZ.

- 35 -

wolves outside the BRWRA—the species' only existing current range. Specifically, the rule expressly authorizes the release of wolves into two of the three zones of the expanded MWEPA and during all three phases of the 12-year reintroduction period. (2015 10(j) Rule at FR000144.) In fact, in the 2015 rule, FWS acknowledges that the "designated experimental population area for Mexican wolves classified as a nonessential experimental population by this rule . . . *is wholly separate geographically from the current range of any known Mexican wolves*." (*Id.* at FR000183 (emphasis added).) Because the 2015 rule authorizes releases outside of the current range of the species, the Court finds that an essentiality determination was required under the plain language of Section 10(j). *See* 16 U.S.C. § 1539(j)(2)(A), (B).

Defendants nevertheless claim that an essentiality determination is not required because the 2015 rule was a "revision" to an existing rule and neither the statute nor the regulations require a new essentiality determination for a revision. Defendants urge the Court to accept that the statute and regulations are therefore ambiguous and that the agency's interpretation that a revision is not required is entitled to deference under *Chevron v. Nat. Res. Def. Council*, 467 U.S. 837 (1984), and *Auer v. Robbins*, 519 U.S. 452 (1997).

The Court is not persuaded that deference is warranted here. First, the Court rejects Defendants' argument that the statute is ambiguous as to when an essentiality determination is required. As discussed above, the ESA is clear that an essentiality determination is required prior to authorizing the release of any population of an endangered species outside the current range of such species. 16 U.S.C. § 1539(j)(2)(A), (B). To the extent FWS argues that an essentiality determination is not required for a revised rulemaking, that interpretation conflicts with the plain language of the statute. Under Defendants' interpretation, the Court would be required to find that an essentiality determination is not required, even where all of the conditions set forth in the statute are met, simply because the rule is denominated a revision by the agency. The Court declines to read the statute in a manner that negates the plain language of the statute. *Chevron*, 467

U.S. at 844 (agency's interpretation is permissible unless "arbitrary, capricious, or manifestly contrary to the statute."); *see also Marsh v. J. Alexander's LLC*, 869 F.3d 1108, 1116–17 (9th Cir. 2017) ("[A] court need not accept an agency's interpretation of its own regulations if that interpretation is inconsistent with the statute under which the regulations were promulgated." (internal changes, quotation marks and citations omitted)). [19]

Second, the agency's proposed interpretation would negate Congress's intent that the essentiality determination be made by regulation. 16 U.S.C. § 1539(j)(2)(B) ("Before authorizing the release of any population under subparagraph (A), the Secretary shall by regulation identify the population and determine, on the basis of the best available information, whether or not such population is essential to the continued existence of an endangered species or a threatened species."). The regulation requirement ensures the benefit of public comment. H.R. Conf. Rep. 97-835, reprinted in 1982 U.S.C.C.A.N 2860, 2875; *accord Wyo. Farm Bureau Fed'n*, 199 F.3d at 1232-33 (citing same); *see also* 49 Fed. Reg. at 33,886 ("Regulations for the establishment or designation of individual experimental populations will be issued in compliance with the informal rulemaking provisions of the [APA], in order to secure the benefit of public comment…."). The importance of proceeding by regulation is apparent here. The Mexican wolf's range is greatly expanded under the new rule, from 6,854 square miles to 153,871 square miles, without the opportunity for public comment on the decision to retain the population's nonessential status.

In sum, the Court concludes that FWS was required to perform a new essentiality determination when it issued the 2015 10(j) rule, which authorized the release of an

---

[19] Defendants rely on Section 10(j)'s implementing regulations, found at 50 C.F.R. § 17.81. These regulations require an essentiality determination whenever the Secretary designates an experimental population that has been or will be released into suitable natural habitat *outside the species' current natural range*. 50 C.F.R. § 17.81(a), (c)(2) (emphasis added). The Court does not find any conflict between Section 10(j)(2) and 50 C.F.R. § 17.81. The ESA's implementing regulations effectively restate the requirements of Section 10(j). *See Gonzales v. Oregon*, 546 U.S. 243, 915–16 (2006) ("the near equivalence of the statute and regulation belies the Government's argument for *Auer* deference").

experimental population outside the species' current range. The agency's suggestion that an essentiality determination is not required for revisions is not a plausible construction of Section 10(j) and conflicts with Congress's express intent that the agency perform an essentiality determination anytime it authorizes the release of a species outside of its current range and that the agency proceed by regulation. *See Resident Councils of Wash. v. Leavitt*, 500 F.3d 1025, 1034 (9th Cir. 2007) (The *Chevron* test "is satisfied if the agency's interpretation reflects a plausible construction of the statute's plain language and does not otherwise conflict with Congress' expressed intent.") (internal quotation marks and citations omitted). FWS's failure to perform this requirement under the ESA prior to authorizing the release of the population under the 2015 10(j) rule was arbitrary and capricious.[20]

B.    Alternatively, FWS's decision to maintain the experimental population's 1998 nonessential designation is not based upon the best available information and is arbitrary and capricious.

Under Section 10(j), the Secretary's determination of whether a population is essential to the continued existence of the species in the wild must be made "on the basis of the best available information." 16 U.S.C. § 1539(j)(2)(B). Agency regulations similarly require that the essentiality finding be "based solely on the best scientific and

---

[20] Defendants also argue that FWS's decision not to revisit the 1998 essentiality determination is not a final agency action that is reviewable under APA Section 706(2)(A), and is more properly characterized as a "failure to act" under APA Section 706(1). *See* 5 U.S.C. § 706(1) (reviewing court shall compel agency action unlawfully withheld or unreasonably delayed). Although FWS did not perform a new analysis, the decision to maintain the 1998 designation nevertheless constitutes a final agency action. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). First, the decision was included in a final rulemaking that marked the consummation of the agency's decision-making process. *See ONRC Action v. Bureau of Land Mgm't*, 150 F.3d 1132, 1136 (9th Cir. 2003). Second, the agency's decision to retain the nonessential status implicated the level of interagency cooperation required under Section 7, 16 U.S.C. § 1536 (requiring federal agencies to confer or consult with FWS on federal actions likely to jeopardize the continued existence of the species, depending on essential or nonessential status). Similarly, the nonessential designation relieved FWS of the duty to designate critical habitat under Section 10(j)(2)(C)(ii). *See* 16 U.S.C. § 1539(j) (2)(C)(ii).

commercial data available, and the supporting factual basis[.]" 50 C.F.R. § 17.81(c)(2). The Secretary must consider whether the loss of the experimental population "would be likely to appreciably reduce the likelihood of the survival of the species in the wild." *See* 50 C.F.R. §§ 17.80(b), 17.81(c)(2). This is a fundamentally biological inquiry and requires the agency to consider existing circumstances and science. FWS failed to do so here.

FWS made no findings regarding the current state of the Mexican wolf experimental population. Rather, it relied on findings it made in 1998, when circumstances were markedly different than they are today. In 1998, the Mexican wolf was part of the listing the North American gray wolf as an endangered species. Under the 1998 rule, the population would occupy the BRWRA, a 6,854 square-mile area. FWS authorized 11 wolves for the initial release, and set a goal of a self-sustaining population of 100 wolves in the wild. There were approximately 150 wolves in captivity to support this reintroduction effort.

In contrast, the 2015 rule pertains to the Mexican wolf as its own newly designated subspecies. The 2015 rule authorizes the release, translocation and dispersal of wolves throughout a greatly expanded MWEPA, which encompasses all of Arizona and New Mexico south of I-40 and totals 153,871 square miles. Although initial releases will only occur in Zones 1 and 2, wolves will be permitted to disperse naturally into all of the expanded MWEPA. Moreover, although in the 17 years since the wolf was first introduced the captive population has grown to approximately 250 wolves, that population is aging and has lost much of its genetic diversity. Finally, the Court notes that the body of scientific knowledge surrounding the Mexican wolf species has grown significantly since 1998, as is demonstrated by many of the recent studies cited by FWS in other portions of the 2015 rule.

In sum, in deciding to maintain the 1998 essentiality determination, FWS failed to account for or consider the present circumstances of the experimental population. Although it is for the agency to interpret and weigh the facts, adopting a decision made

1    17 years prior without explanation does not satisfy the agency's duty to base its decision

2    on the best available science and information or to articulate a rational connection

3    between the facts found and the conclusion reached. Accordingly the Court finds that the

4    agency's decision to maintain the Mexican wolf's nonessential status in the 2015

5    rulemaking was arbitrary and capricious. *See Forest Guardians*, 329 F.3d at 1099

6    (agency must articulate a rational connection between the facts found and the choice

7    made); *Judulang v. Holder*, 565 U.S. at 53, 55 (reasons for agency decisions must be

8    based on non-arbitrary, relevant factors that are tied to the purpose of the underlying

9    statute). The Court will grant summary judgment in favor of WEG in case No. CV-15-

10   00285-TUC-JGZ on this ground.

### REMEDY

12   Having found that the 2015 10(j) rule is not compliant with the ESA, the Court

13   must determine the proper remedy. Plaintiffs CBD and WEG ask the Court to sever and

14   vacate only the challenged portions of the Section 10(j) rule.[21] Federal Defendants and

15   the State of Arizona request that the Court remand the rule without *vacatur* for agency

16   reconsideration.

17   Although not without exception, *vacatur* of an unlawful agency rule normally

18   accompanies a remand. *Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs*,

19   486 F.3d 638, 654 (9th Cir. 2007), *rev'd and remanded on other grounds sub nom. Coeur*

20   *Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261 (2009); *Alsea Valley All.*

21   *v. Dep't of Commerce*, 358 F.3d 1181, 1185 (9th Cir. 2004). This is because "[o]rdinarily

22   when a regulation is not promulgated in compliance with the APA, the regulation is

23   invalid." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995). The

---

[21] CBD asks the Court to vacate (1) the challenged provisions of the Revised 10(j)
Rule (50 C.F.R. § 17.84(k)(9)(iii) (imposing population cap); 50 C.F.R. § 17.84(k)(7)(vi)
(allowing taking in response to ungulate impacts); and 50 C.F.R. § 17.84(k)(9)(iv)
(providing for phased management in Arizona); and (2) the challenged provision of the
section 10(a)(1)(A) permit restricting Mexican wolf occupancy outside the experimental
population area in areas north of Interstate 40. (Doc. 115, p. 47.) WEG similarly requests
that the Court "set aside portions of the revised rule, portions of the section 10(a)(1)(A)
permit, . . . and remand this matter back to the Service for further proceedings and
analysis . . . ." (Doc. 112, p. 50.)

usual effect of invalidating an agency rule is to reinstate the rule previously in force. *Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005).

When equity demands, however, the regulation can be left in place while the agency reconsiders or replaces the action, or to give the agency time to follow the necessary procedures. *See Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010); *Idaho Farm Bureau Fed'n*, 58 F.3d at 1405. A federal court "is not required to set aside every unlawful agency action," and the "decision to grant or deny injunctive or declaratory relief under APA is controlled by principles of equity." *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) (citations omitted). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). Harm to endangered or threatened species is considered irreparable harm, and the balance of hardships will generally tip in favor of the species. *See Marbled Murrelet v. Babbitt,* 83 F.3d 1068, 1073 (9th Cir. 1996) ("Congress has determined that under the ESA the balance of hardships always tips sharply in favor of endangered or threatened species."); *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."); *see also*, *e.g.*, *Defs. of Wildlife v. Sec'y, U.S. Dep't of the Interior*, 354 F. Supp. 2d 1156, 1174 (D. Or. 2005) (lethal and non-lethal harm to gray wolf found to be irreparable injury that warranted injunction and *vacatur* of final rule changing status of gray wolf from endangered to threatened in some regions); *Hoopa Valley Tribe v. Nat'l Marine Fisheries Serv.*, No. 16-CV-04294-WHO, 2017 WL 512807, at *24 (N.D. Cal. Feb. 8, 2017) ("Evidence that the Coho salmon will suffer imminent harm of any magnitude is sufficient to warrant injunctive relief.").

Here *vacatur* of the 2015 rule and return to the provisions of the 1998 rule would constitute a further setback for the species that serves no purpose. *Sierra Forest Legacy v. Sherman*, 951 F. Supp. 2d 1100, 1107 (E.D. Cal. 2013) (rejecting *vacatur* of management framework that was "environmentally preferable" to the prior one). Instead, the Court will remand and require the agency to address the deficiencies discussed herein within a reasonable time.[22] This approach will also give the agency the opportunity to coordinate any remedial action with the recovery recommendations in the recently published revised recovery plan. Accordingly, the final rule shall remain in effect until the Service issues a new rulemaking, at which time the January 16, 2015 final rule will be superseded.

Because further agency action will be required, the Court will not reach the parties' challenges to the November 17, 2014 Biological Opinion or the parties' arguments under NEPA.

## CONCLUSION

While the prospect of further delays in wolf recovery is discouraging, it is not the province of this Court to make policy decisions, but to ensure compliance with statutory requirements. Where, as here, the agency achieved an outcome that fails to adhere to the guidelines set by Congress, the Court may not uphold that action, no matter how carefully negotiated or hard-fought it may have been. For all of the reasons stated herein,

---

[22] The Court declines Plaintiffs CBD and WEG's request to sever and vacate the challenged portions of the Section 10(j) rule. The Court concludes that the equities weigh in favor of retention of the current rule, including the challenged provisions, as these provisions are unlikely to cause irreparable harm in the near future. With regards to the population cap and the limitation on dispersal north of I-40, the number of wolves in the experimental population is not expected to reach 300-325 wolves until year 13 of the program and the agency anticipates that few wolves will initially disperse north of I-40 under the phased management approach. With respect to the provision that allows for take in response to unacceptable impacts to wild ungulate herds, the evidence suggests that since reintroduction commenced, there has been "no discernable impact" from Mexican wolf predation on elk in the BRWRA, and it is anticipated that wolves will have little or no effect on the abundance of elk and deer across most of Arizona and New Mexico. Moreover, it is clear that in drafting the present Section 10(j) rule, the take provisions are critical to conciliating those opposed to the reintroduction effort, and severing them would be contrary to the agency's intent to draft a rule that furthers the effectiveness of the reintroduction effort. See *MD/DC/DE Broadcasters Assoc. v. FCC*, 236 F. 3d 13, 22 (D.C. Cir. 2001) (whether the offending portion of a regulation is severable depends upon the intent of the agency).

**IT IS ORDERED** as follows:

1. In lead case No. CV-15-00019-TUC-JGZ, Plaintiff CBD's Motion for Summary Judgment (doc. 114) is GRANTED IN PART and DENIED IN PART to the extent provided herein. Federal Defendants' Cross-Motion for Summary Judgment (doc. 123) is DENIED. Defendant-Intervenor Arizona's Cross-Motion for Summary Judgment (doc. 129) is DENIED.

2. In consolidated case No. CV-15-00285-TUC-JGZ, Plaintiff WEG's Motion for Summary Judgment (CV-15-00019-TUC-JGZ, doc. 111) is GRANTED IN PART and DENIED IN PART to the extent provided herein. Federal Defendants' Cross-Motion for Summary Judgment (CV-15-00019-TUC-JGZ, doc. 133) is DENIED. Defendant-Intervenor Arizona's Cross-Motion for Summary Judgment (CV-15-00019-TUC-JGZ, doc. 141) is DENIED.

3. In consolidated case No. CV-15-00179-TUC-JGZ, Plaintiff the Coalition's Motion for Summary Judgment (CV-15-00019-TUC-JGZ, doc. 108) is DENIED. Federal Defendants Cross-Motion for Summary Judgment (CV-15-00019-TUC-JGZ, doc. 137) is GRANTED IN PART and DENIED IN PART to the extent provided herein. Defendant-Intervenor CBD's Cross-Motion for Summary Judgment (CV-15-00019-TUC-JGZ, doc. 147) is GRANTED IN PART and DENIED IN PART to the extent provided herein.

4. In related case No. CV-16-00094-TUC-JGZ, Plaintiff SCI's Motion for Summary Judgment (doc. 67) is DENIED. Federal Defendants Cross-Motion for Summary Judgment (doc. 70) is GRANTED IN PART and DENIED IN PART to the extent provided herein. Defendant-Intervenor CBD's Cross-Motion for Summary Judgment (doc. 78) is GRANTED IN PART and DENIED IN PART to the extent provided herein.

**IT IS FURTHER ORDERED** that the January 16, 2015 final rule, 80 Fed. Reg. 2512, *et seq.*, is hereby REMANDED to the Service for further action consistent with this order. The final rule shall remain in effect until the Service issues a new final rule for the

experimental population of Mexican gray wolves, or otherwise remedies the deficiencies identified in this Order, at which time the January 16, 2015 final rule will be superseded.

**IT IS FURTHER ORDERED** that within 30 days of the date of this Order, the parties shall provide to the Court a proposed deadline for the publication of a revised 10(j) rulemaking or other remedial action.

Dated this 31st day of March, 2018.

Honorable Jennifer G. Zipps
United States District Judge